## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## DETROIT

_____

**ASHLEY J.,**
**PARENT AND NEXT FRIEND OF K.A.**
**A MINOR**


                          **Plaintiffs,**                    **Civil Action No. _____**

        **v.**

**Serve:**                                                   **COMPLAINT**
**GRETCHEN WHITMER**
**IN HER OFFICIAL CAPACITY AS**
**GOVERNOR OF THE**
**STATE OF MICHIGAN**
**OFFICE OF THE GOVERNOR**
**THE MICHIGAN STATE CAPITOL**


**Serve:**
**DR. MICHAEL F. RICE, Ph.D.**
**IN HIS OFFICIAL CAPACITY AS**
**STATE SUPERINTENDENT**
**MICHIGAN DEPARTMENT OF EDUCATION**


**Serve:**
**DR. PAMELA PUGH, Ph.D.**
**IN HER OFFICIAL CAPACITY AS**
**PRESIDENT STATE BOARD OF EDUCATION**
**MICHIGAN DEPARTMENT OF EDUCATION**


**Serve:**
**DANA NESSEL, ESQUIRE**
**IN HER OFFICIAL CAPACITY AS**
**ATTORNEY GENERAL FOR**
**THE STATE OF MICHIGAN**

1

Serve:
**DR. NIKOLAO VITTI**
**IN HIS OFFICIAL CAPACITY AS**
**SUPERINTENDENT OF**
**THE DETROIT PUBLIC SCHOOLS**
**COMMUNITY DISTRICT**


Serve:
**JANCE C. MITCHELL FORD, ESQUIRE**
**IN HER OFFICIAL CAPACITY AS**
**GENERAL COUNSEL FOR THE**
**THE DETROIT PUBLIC SCHOOLS**
**COMMUNITY DISTRICT**


**Defendants**

---

## COMPLAINT

**COMES NOW** the Plaintiffs, Ashley J. as the parent and next friend of her minor daughter

K.A..[1], by and through their counsel, Roy Carleton Howell, and respectfully state their case

before this Honorable Court as follows.

---

[1] Pursuant to the _ORDER_ of Administrative Law Judge Paul Smith the minor was identified in all administrative pleading before the Michigan Office of Administrative Hearings and Rules as _K.A. In the Matter of A.J. o/b/o K.A. v. Detroit Public Schools Community District,_ Docket No: 23-003782, Case No: DP-23-0007, Agency: Education, Case Type: ED. Sp. Ed. Regular.

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.    THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

(ALLEGATION-1)  *INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT (IDEIA),
20 U.S.C. §§ 1400 – 1461* VIOLATIONS . . . . . . . . . . . . . . . , . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   (a.) Plaintiff Made On-Going Requests for Evaluations of K.A. Pursuant to *20 USC §
        1414(a)(1)(B) and 34 CFR § 300.301(b),* and those Requests were Ignored or
        Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

   (b.) Pursuant to *20 USC § 1414(a)(1)(B) and 34 CFR § 300.301(b),* the *Child Find* Obligation of
        Defendants was Triggered When Plaintiff Requested Evaluation of K.A. for Special
        Education Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

   (c.) The Fact Defendants Passed K.A. From Grade to Grade Does not Relieve Defendants of
        their *Child Find* Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

   (d.) Defendants had Suspicions of K.A.'s Disabilities from Kindergarten to Present, and was
        Obligated to Evaluate K.A. pursuant to *Child Find* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

      *(i)     ALJ Smith's citation of 34 C.F.R. § 300.507(a)(2) and U.S.C. § 1415(f)(3)(C)
               is inapposite and not a bar to Plaintiff's "Child Find" cause of action for K.A's first
               grade year of 2020-2021, second grade year of 2021-2022, and third grade year
               of 2022-2023* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      *(ii)    Congress intended K.A. to be timely evaluated and provided a free appropriate
               public education (FAPE)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

(e.) Defendants were fully aware of K.A.'s years of Failures of the Michigan Standardized Examinations, and Failed to Execute their *Child Find* Obligations . . . . . . . . . . . . . . . . . .24

(ALLEGATION-2) ALJ SMITH'S FINDING OF FACT THAT DPS CONTACTED PLAINTIFF AND CONSENTED TO PERFORM EVALUATIONS IS FALSE, MISLEADING, AND NOT CORRECT . . . . . . .25

(a.) Plaintiff made on-going Requests for Evaluations of K.A. Pursuant to *20 USC § 1414(a)(1)(A) and (B) and 34 CFR § 300.301(b)*, and those Requests were Ignored or Denied. *See*, Exhibits 2, 3, and 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

(i)   There is no documentary evidence within the Administrative Record that Shows Defendants Contacting Plaintiff and Consenting to Perform Evaluations on K.A. Therefore, ALJ Smith's Finding of Fact that Defendants Contacted Plaintiffs and Offered to Perform Evaluations is not Based on Documentary Evidence from the Administrative Record, and is Reversible Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

(ii)  Any Settlement from Defendants came after Plaintiff Hired Counsel and/or Filing of a Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

(ALLEGATION-3) DEFENDANTS WERE AWARE THAT PLAINTIFFS HAD RETAINED A LAWYER, AND WERE OBLIGATED TO COMMUNICATE WITH SAID COUNSEL PURSUANT TO *ABA RULE 4.2 - COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL* AND *MICH. R. EVID. 408 - COMPROMISE AND OFFERS TO COMPROMISE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..27

(i.)  ALJ Smith's finding of fact that Defendants did not Learn of Plaintiff's Retained Counsel until Shortly after a Schedule Meeting is not Correct. Plaintiff Immediately told Defendants she had an Attorney in a call Immediately Following Defendants Receipt of Plaintiff's November 26, 2022 Demand Letter . . . . . . . . . . . . . . . . . . . . . .28

(ALLEGATION-4) ALJ SMITH'S FINDING OF FACT THAT PLAINTIFFS FAILED TO PROVIDE DEFENDANTS CONSENT TO CONDUCT EVALUATIONS OF K.A. IS NEITHER SUPPORTED BY DOCUMENTARY EVIDENCE IN THE RECORD, NOR REASON, OR LOGIC . . . . . . . . . . . . . . . . . . . . 29

(ALLEGATION-5) AS A MATTER OF LAW DEFENDANTS ARE NOT EXCUSED FROM CHILD FIND OBLIGATIONS BY THE ABSENCE OF PLAINTIFF'S CONSENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

(i)   Absence of Parental Consent for an Initial Evaluation of K.A. did not Absolve Defendants' Child Find Obligations and Providing K.A. FAPE . . . . . . . . . . . . . . . . . . .31

(ii)  *Pursuant to 20 USC § 1412(a)(3), Child Find Obligated Defendants to Initiate Affirmative Steps to Evaluate K.A. for Special Education Services Even Absent Plaintiff's Requests* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(ALLEGATION-6) ALJ SMITH'S FINDING THAT THE PARENT LACKED CREDIBILITY WAS NOT BASED ON EVIDENCE, CHARACTER, IMPEACHMENT, OR VERICITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(i)  *According to Special Education Treatises, Plaintiff is a Genuine Parental Advocate* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

(ii)  *ALJ Smith's Finding that Plaintiff (mother) Lacked Credibility was Based on Racial and Gender Bias in Violation of Plaintiffs' Fourteenth Amendment Rights to the U.S. Constitution* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

(ALLEGATION-7) ALJ SMITH'S STATISTICAL INTREPRETATION OF K.A.'S STANDARDIZED EXAMINATION SCORES ARE MISLEADING, AND PAINT A FALSE PICTURE IN CONTRAST TO THE UNASSAILABLE DATA THAT K.A. IS VERY FAR BEHIND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

(ALLEGATION-8) DEFENDANTS' FAILURE TO EXECUTE NECESSARY, AND PROPER EVALUATIONS OF K.A. DENIED HER A FAPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(a.) The Record Supports the Conclusion that Defendants violated the IDEA by Failure to Conduct a Psycho-educational Evaluation with a Woodcock – Johnson II Test on K.A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45

(b.) The Record Supports a Conclusion That Defendants Violated the IDEA by Failure to Conduct the Weschler Intelligence Scale for Children Evaluation on K.A. . . . . . . . . . . 46

(c.) The Record Supports a Conclusion That Defendants Violated the *IDEA* by Failure to Conduct an Occupational Therapy Evaluation on K.A. Regarding Handwriting Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

(d.) The Record Supports a Conclusion That Defendant Violated the *IDEA* by Failure to Conduct a Speech and Language Evaluation on K.A. . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

(ALLEGATION-9) THIS COURT HAS AUTHORITY TO COMPEL THE GOVERNMENT TO PROVIDE PLAINTIFFS COMPLETE COPIES OF ALL HEARING AND PRE-HEARING TRANSCRIPTS PURSUANT TO *34 CFR § 300.512(C)(3)* AT NO CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

(ALLEGATION-10) DEFENDANTS ARE UNABLE TO PROVIDE K.A. FAPE, THUS PRIVATE PLACEMENT IS NECESSARY AND PROPER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

(ALLEGATION-11) CIVIL ACTION FOR THE DEPRIVATION OF RIGHTS, 42 U.S.C. § 1983 – LITERACY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    (i)    K.A.'s Literacy Is a Fundamental Right, and there is a disparity in State education resources to K.A. and those similarly situated juxtaposed to non-minorities and non-disabled minorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    (ii)    The Meaning of Literacy and Literacy Instruction for K.A. . . . . . . . . . . . . . . . . . . . . . 50

    (iii)    K.A.'s Literacy Guarantee Is the Foundation of Citizenship and Well-Being in a Democratic Society . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    (iv)    The Tradition of Compulsory Education in the United States Guarantees K.A.'s Literacy Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

    (v)    K.A.'s Exclusion from Access to Literacy Creates an Enduring Stigma . . . . . . . . . . . . 64

    (vi)    DPS failed to provide K.A. Literacy because it is a continuing failed system, and Michigan is Ultimately Responsible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

(ALLEGATION-12) MICHIGAN IS RESPONSIBLE AND LIABLE TO K.A. FOR PUBLIC EDUCATION PURSUANT TO STATE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    (i)    Michigan Constitution guarantees K.A.'s free public education and the State has failed to execute a policy to insure K.A. a free public education pursuant to the Michigan Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

(ALLEGATION-13) DECIMATION OF DETROIT PUBLIC SCHOOLS, FAILURE TO EDUCATE K.A., AND INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70

(ALLEGATION-14) CONTINOUS FAILED STATE INTERVENTIONS TO ADDRESS LITERACY CRISIS IN DETROIT, AND K.A. HAS A FUNDAMENTAL RIGHT TO LITERACY PIURSUANT TO GARY B. V. WHITMER, 957 F.3d 616 (6th Cir. 2020) WHICH HAS BEEN VIOLATED . . . . . . . . .70

    (i.)    <u>Gary B, et al</u>,. v. <u>Whitmer, et al</u>. 957 F.3d 616 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . .71

(ALLEGATION-15) M-STEP STANDARDIZED TEST SCORES PROVE DEFENDANTS' FAILURE
TO PROVIDE LITERACY AND *FAPE* TO K.A.  SUCH FAILURE VIOLATES *IDEA*, AND
<u>GARY B, ET AL</u>, V. <u>WHITMER, ET AL</u>, 957 F.3d 616, 642 (6th Cir. 2020), AND THE
MICHIGAN CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    (i)    *The Michigan Student Test of Educational Progress ("M-STEP") is very*
        *Significant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

(ALLEGATION-16) DEFENDANTS' DENIAL OF LITERACY AND A *FAPE* TO K.A. AND THOSE
SIMILARILY SITUATED, DENIES THEM GRADUATION AND COLLEGE ATTENDANCE, AND
VIOLATES RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

(ALLEGATION-17) THERE ARE INSUFFICIENT ALLOCATED RESOURCES, TRAINED SPECIAL
EDUCATIONAL PROFESSIONALS, SMALL CLASS SIZES, SECURITY, AND TRANSPORTATION
SERVICES TO PROVIDE K.A. AND STUDENTS SIMILARILY SITUATED WITH LITERACY
AND *FAPE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    (i)    *Intervention and Remediation for K.A.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75

    (ii)    *Extreme Heat, and Necessity for Air-Conditioned Summer School for ESY* . . . . . . . . 75

(ALLEGATION-18) FAILURE TO PROVIDE J.L. A SAFE SCHOOL ENVIRONMENT FOR
LEARNING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    (i)    *Absence of Support to Address Trauma and Social-Emotional Health* . . . . . . . . . . . 76

(ALLEGATION-19) UNSUPPORTED AND UNSTABLE TEACHING STAFF AND SUPPORT STAFF
INJURE K.A. AND OTHERS SIMILARILY SITUATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . .77

    (i)    *Vacancies and Lack of Qualified, Full-Time Teachers, Professionals, and staff*
        *Injured K.A. and others Similarly Situated* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77

    (ii)    *Legislation Which Permitted Non-Certificated Teachers Injured K.A. and*
        *Others, and is a continuing legacy of problems* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

(ALLEGATION – 20) DEFENDANTS' EDUCATION SYSTEM IS A FAILED SYSTEM WHERE MANY DETROIT CHILDREN ARE ILLITERATE, AND 47% OF THE ADULT DETROIT POPULATION IS ILLITERATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

    (i)    *The Fact Defendant-DPS is a Predominately Black School System under the Dominion Control and Responsibility of Defendant-Michigan, does not Excuse Defendants from Violations of the Equal Protection Clause to the Fourteenth Amendment for Discrimination on the basis of race and Disability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    (ii)    *United States Supreme Court Justice Clarence Thomas, and the failure of School Systems to Educate Blacks* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

(V.)    AVERMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

 FIRST CAUSE OF ACTION – *Violation of Individuals with Disabilities Education Improvement Act (IDEIA), 20 U.S.C. §§ 1400 – 1461* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

SECOND CAUSE OF ACTION – ALJ Paul Smith's Finding that the Plaintiff-Mother was not Credible was Based upon Racial and Gender Prejudice in Violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution – Discrimination on the Basis Race and Gender . . . . . . . . . . . . . . . . .82

THIRD CAUSE OF ACTION- K.A. as a Student and/or Disabled Student has a Fundamental Right to Literacy Pursuant to *Gary B., et el., v. Whitmer, et al, 957 F.3d 616 (6th Cir. 2020),* and hat Basic Right has been Violated . . . . . . . . . . . . . . . . . . . . . . . 82

FOURTH CAUSE OF ACTION - Violation of *42 U.S.C. § 1983,* Plaintiffs Against All Defendants for Violation of Plaintiffs' Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution – Discrimination on the Basis of Handicap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

FIFTH CAUSE OF ACTION - Violation of *42 U.S.C. § 1983,* Plaintiffs Against All Defendants for Violation of Plaintiffs' Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution – Discrimination on the Basis of Race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

SIXTH CAUSE OF ACTION - Violation of the *ADA, 42 U.S.C. § 12101 (a)(1)* Plaintiffs Against All Defendants for Maintaining a Detroit School System which Fails to Accommodate the Disabled, Handicapped, and Discriminates against K.A., and Injures Children with Learning Disabilities, and/or Emotional Disabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84

SEVENTH CAUSE OF ACTION - (All Plaintiffs Against All Defendants for Declaratory Relief) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

(V.)     PRAYER FOR REMEDIES FOR PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86

    (a.)     PURSUANT TO *34 CFR § 300.303(a)(b)(2)* A COURT MAY ORDER DEFENDANTS TO EXECUTE APPROPRIATE EVALUATIONS OF K.A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    (b.)     PURSUANT TO *BOARD OF EDUCATION OF FAYETTE COUNTY V. L.M., 478 F.3d 307, 316 (6th Cir. 2007)* A COURT MAY GRANT K.A. COMPENSATORY EDUCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    (c.)     PURSUANT TO *34 CFR § 300.105* THIS COURT MAY ORDER DEFENDANTS TO EVALUATE AND PROVIDE K.A. NECESSARY AND PROPER ASSISTIVE TECHNOLOGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .87

    (d.)     IT IS NECESSARY AND PROPER FOR K.A. TO RECEIVE *ESY* TO PREVENT REGRESSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .88

    (e.)     K.A.'S NEIGHBORHOOD SCHOOL IS CLOSED IN SUMMER AND SHE WILL REQUIRE BUS TRANSPORTATION FOR *ESY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .89

    (f.)     THIS COURT HAS AUTHORITY TO COMPEL DEFENDANTS TO PROVIDE PLAINTIFF-MOTHER A FULL AND COMPLETE COPY OF ALL HEARING AND PRE-HEARING TRANSCRIPTS PURSUANT TO *34 CFR § 300.512*, AND AT NO CHARGE, *34 CFR § 300.512 (C)(3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    (g.)     THIS COURT MUST ORDER DEFENDANTS TO CONSIDER PRIVATE PLACEMENT OF K.A. IN A PRIVATE SPECIAL EDUCATION PROGRAM BECAUSE OF ITS INABILITY TO PROVIDE *FAPE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90

(h.)   PLAINTIFF-K.A. HAS A BASIC RIGHT TO LITERACY AS GUARANTEED BY LAW,
       AND THIS COURT MUST ENFORCE K.A.'S RIGHTS PURSUANT TO *GARY B.,*
       *ET AL*. *V. WHITMER, ET AL,* 957 *F.3d 616 (6th Cir. 2020)* . . . . . . . . . . . . . . . . . . . . . . . .91

(i.)   PLAINTIFFS HAVE A STATUTORY RIGHT TO ATTORNEYS' FEES AND COSTS
       PURSUANT TO THE *INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT*
       *ACT, 20 U.S.C. § 1400 ET SEQ* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

(j.)   PLAINTIFFS HAVE A STATUTORY RIGHT FOR ATTORNEYS' FEES AND COSTS
       PURSUANT TO *42 U.S.C. § 12205* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

(k.)   PLAINTIFFS PRAY THAT THIS COURT MAINTAIN JURISDICTION OVER THIS CASE
       UNTIL ALL JUDICIAL ORDERS ARE COMPLIED WITH BY THE PARTIES . . . . . . . . . . . . 92

(l.)   PLAINTIFFS PRAY THAT THIS COURT SHALL PROVIDE ALL RELIEF IT DEEMS JUST
       AND PROPER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

**(I.)   PRELIMINARY STATEMENTS**

1.   This is an appeal pursuant to *20 U.S.C. § 1415(i)(2)(A)* of the 28th August 2023 <u>Decision</u> <u>and Order</u> of Administrative Law Judge (ALJ) Paul Smith,[2] which violated the *Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461,* federal rights of Plaintiffs, the laws of the United States, and the intent of Congress.

2.   The parties filed <u>Closing Argument Briefs,</u> and on 28th August 2023 AJL Paul Smith filed a 19-page <u>Decision and Order</u> which conflicted with the evidence, the administrative record, federal laws. ALJ Smith reached incorrect and unreasonable conclusions in contradiction to the intent of Congress, and the federal common law. *See, Exhibit 1.* Plaintiffs respectfully differ with ALJ Smith, and seek judicial review in compliance with ALJ Smith's <u>Decision and Order</u>. Regarding Plaintiffs' right to judicial review, ALJ Smith wrote:

> A party aggrieved by this decision may seek judicial review by
> filing an action in a court of competent jurisdiction within 90
> days of the date of this order.  *See, Exhibit 1, at p. 18.*

3.   Plaintiffs are aggrieved by ALJ Smith's determination, and in good faith seek judicial review before this Honorable Court pursuant to his <u>Decision and Order</u>.

4.   This is a cause of action against the State of Michigan, and Detroit Public Schools Community District (DPS) brought under *42 U.S.C. § 1983* based on the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, and other

---

[2] *See, In the Matter of* <u>A.J. o/b/o.  K.A..</u> v. <u>Detroit Public Schools Community District,</u> *Docket No:* *23-003782, Case No: DP-23-0007, Agency: Education, Case Type: ED. Sp. Ed. Regular.* (Michigan Office of Administrative Hearings and Rules).

federal rights. As an indigent, inner-city disabled child K.A.'s federal rights were violated.

5. This is a cause of action against the State of Michigan, and Detroit Public Schools Community District (DPS) pursuant to *Gary B., et al. v. Whitmer, et al., 957 F.3d 616, 662 (6th Cir. 2020)* which held that children have a fundamental right to a basic education.

6. This is a cause of action against the State of Michigan, and Detroit Public Schools Community District (DPS) pursuant to Michigan's current State Constitution which mandates that "[t]he Legislature shall maintain and support a system of free public elementary and secondary schools as defined by law," *Mich. Const., art. VIII, § 2*, and vests "leadership and general supervision over all public education" in the State Board of Education, *id. art. VIII § 3*.

### (II.)   JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to the *Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461*.

8. This Court has jurisdiction pursuant to *Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794*.

9. This Court has jurisdiction pursuant to *42 U.S.C. § 1983 Civil Action for Deprivation of Rights*.

10. This Court has jurisdiction pursuant to *28 U.S.C § 1331 Federal Question*.

11. This Court has jurisdiction pursuant to *28 U.S.C § 1343 Civil Rights and Elective Franchise*.

12 Declaratory relief is authorized by *28 U.S.C. §§ 2202 and 2202*.

13. This Court has jurisdiction pursuant to the Americans With Disabilities Act, *42 U.S.C. § 12101(a)(1) (ADA)*.

14. This Court has jurisdiction pursuant to *Mich. Const., art. VIII, § 2*.

*15.* This Court has jurisdiction pursuant to common law negligence. *See,* <u>Hill</u> v. <u>Sears,</u> <u>Roebuck & Co</u>, *492 Mich 651, 660;  683  NW2d 587 (2012).*

16. Venue is proper in this Court pursuant to *28 U.S.C. § 1391*.

### (III.)   THE PARTIES

**(Plaintiffs)**
17. Ashley J. is a mixed-race American citizen of the United States, resident of the State of Michigan, and mother of K.A.  Ashley J. brings this suit as the mother and next friend of the minor K.A.

*18.* K.A. is a 9-year and 11-month-old, indigent, Black-American minor who was born in Detroit, Michigan. All K.A.'s standardized test scores place her years behind. Although Defendants have passed K.A. with above average grades her entire schooling, she **cannot** perform the following: (i) read and comprehend elementary books; (ii) perform addition at grade level; (iii) perform subtraction at grade level; (iv) perform multiplication; (v) perform division; (iv) understand fractions; (vii) understand simple geography; (viii) know simple historical facts; (ix) read a ruler; (x) read a thermometer; (xi) understand a compass; (xii) understand simple rules of sciences. Here, *sub-judice*, K.A. has a right to evaluations pursuant to the *Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. § 1414((a)(1)(B) and 34 CFR § 300.301(b)*, basic literacy, and all federal remedies.

**(Defendants are liable in their official capacities)**

*19.* Gretchen Whitmer is the governor of Michigan, and is sued in her official capacity.

Education in Michigan is not a mere local concern, but belongs to the State at large. *Board of*

*Education* v. *Bacon, 162 N.W. 416, 416 (Mich. 1917)* (quoting *Collins* v. *City of Detroit, 161 N.W.*

*905, 907 (Mich. 1917)*. Under Michigan law, the state has oversight authority over school

districts and public schools within the state. *See, Mich. Comp. Laws §§ 380.1281, 388.1007,*

*388.1009*.  State funding and oversight provisions place public schools "under the ultimate and

immediate control of the state and its agents." *Council of Orgs. & Others for Educ. About*

*Parochild, Inc*. v. *Engler, 566 N.W. 2d 208, 216 (Mich. 1997)*. Pursuant to *Gary B., et el. v.*

*Whitmer, et. al, 957 F.3d 616 (6th Cir. 2020)*, Defendant Whitmer is a proper party defendant.

As chief executive officer of the State of Michigan, Defendant Whitmer has the ultimate

obligation to ensure that all Michigan public school students receive their fundamental right to

literacy.

*20.* Dr. Michael F. Rice is the State Superintendent of the Michigan Department of Education,

and is sued in his official capacity. Education in Michigan is not a mere local concern, but

belongs to the State at large. *Board of Education* v. *Bacon, 162 N.W. 416, 416 (Mich. 1917)*

(quoting *Collins* v. *City of Detroit, 161 N.W. 905, 907 (Mich. 1917)*. Under Michigan law, the state

has oversight authority over school districts and public schools within the state. *See, Mich.*

*Comp. Laws §§ 380.1281, 388.1007, 388.1009*.  State funding and oversight provisions place

public schools "under the ultimate and immediate control of the state and its agents." *Council of*

*Orgs. & Others for Educ. About Parochild, Inc*. v. *Engler, 566 N.W. 2d 208, 216 (Mich. 1997)*.

Pursuant to  *Gary B., et el. v. Whitmer, et. al,  957 F.3d 616 (6th Cir. 2020)*, Defendant Rice is a

proper party defendant. The Superintendent is appointed by and responsible to the State Board of Education. *Const. 1963, art 8, § 3; Mich. Comp. Laws § 388.1014*. He is the principal executive officer of the Michigan Department of Education, the department of the State of Michigan government responsible for administering and enforcing laws related to public education. *Mich. Comp. Laws § 16.400-16.402*. The Superintendent sits on the Governor's Cabinet, the State Administrative Board, and acts as chair and a non-voting member of the State Board of Education. The Superintendent is responsible for the implementation of bills passed by the Legislature and policies established by the State Board of Education. He is also the primary liaison to the United States Department of Education and other federal agencies.

21. Dr. Pamela Pugh is the President of the Michigan State Board of Education, and is sued in her official capacity. Education in Michigan is not a mere local concern, but belongs to the State at large. *Board of Education v. Bacon,* 162 N.W. 416, 416 (Mich. 1917) (quoting *Collins v. City of Detroit,* 161 N.W. 905, 907 (Mich. 1917)*.* Under Michigan law, the state has oversight authority over school districts and public schools within the state. *See, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009.* State funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents." *Council of Orgs. & Others for Educ. About Parochild, Inc. v. Engler,* 566 N.W. 2d 208, 216 (Mich. 1997)*.* Pursuant to *Gary B., et el. v. Whitmer, et. al,* 957 F.3d 616 (6th Cir. 2020)*.* Defendant Pugh is a proper party defendant. The State Constitution provides that the State Board of Education retains "[l]eadership and general supervision over all public education" and is the "planning and coordinating body for all public education." *Const. 1963, art. 8, § 3; see also Michigan Compiled Laws ("Mich. Comp. Laws") § 388.1009 et seq.*

22. Danna Nessel is the attorney general for the State of Michigan, and is responsible for

Michigan's compliance with the law. She is sued in her official capacity. Education in Michigan is

not a mere local concern, but belongs to the State at large. _Board of Education_ v. _Bacon_, 162

_N.W. 416, 416 (Mich. 1917) (quoting _Collins_ v. _City of Detroit_, 161 N.W. 905, 907 (Mich. 1917).

Under Michigan law, the state has oversight authority over school districts and public schools

within the state. _See, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009._  State funding and

oversight provisions place public schools "under the ultimate and immediate control of the state

and its agents." _Council of Orgs. & Others for Educ. About Parochild, Inc._ v. _Engler_, 566 N.W. 2d

208, 216 (Mich. 1997). Pursuant to _Gary B., et el._ v. _Whitmer, et. al_, 957 F.3d 616 (6th Cir. 2020),

Defendant Nessel is a proper party defendant.

23. Dr. Nikolai Vitti is the superintendent of Detroit Public Schools Community District and is

responsible for the day-to-day administration of Detroit Public Schools. _See, e.g., Mich. Comp._

_Laws § 380.1282._ He is sued in his official capacity.

24. Janice C. Mitchell Ford is the general counsel of Detroit Public Schools Community

District and is responsible for the school system's compliance with the law. She is sued in her

official capacity.

### IV.)   FACTUAL ALLEGATIONS

**(ALLEGATION-1)** _**INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT (IDEIA), 20**_
_**U.S.C. §§ 1400 – 1461 VIOLATIONS.**_

25. K.A. began her schooling within the Detroit Public Schools Community District (DPS) at

Neinas Elementary for kindergarten, then Priest Elementary-Middle School for first, second and

16

third grade.

26. K.A.'s biological brother D.A. is non-verbal with severe autism. Plaintiff disclosed the fact of genetic autism in K.A.'s family to Defendants.

27. All of K.A.'s standardized test scores show her falling behind, and show failure to achieve grade level.  According to K.A.'s current standardized test score she is far behind, and falling further behind. Plaintiff brought K.A.'s need for evaluation and help to Defendants' attention orally in kindergarten, first grade, and second grade. Finally, she provided Defendants written and oral notice for evaluation in grade three upon hiring a lawyer.

28. Plaintiff is a hands-on parent who attended PTA, conferences, and works with K.A. at home on school work. Plaintiff has observed, realized, and knows that K.A. **cannot** perform the following: (i) read and comprehend elementary books; (ii) perform addition at grade level; (iii) perform subtraction at grade level; (iv) perform multiplication; (v) perform division; (iv) understand fractions; (vii) understand simple geography; (viii) know simple historical facts; (ix) read a ruler; (x) read a thermometer; (xi) understand a compass; (xii) understand simple rules of sciences.

29. Defendants have passed K.A. from grade to grade with above average grades.  However, the record is unambiguous that K.A.'s standardized test scores were and are significantly below grade level. The evidence shows that Plaintiff brought K.A.'s low standardized test scores, juxtaposed to her passing grades and inability to read and write, to Defendants' attention on numerous occasions. Sadly, Defendants' chose to close their eyes to the obvious disjunctive.

30. The record shows that Plaintiff made numerous documented efforts to get Defendant

to evaluate K.A. by doing the following on November 26, 2022: (i) Plaintiff wrote K.A.'s teacher

Ms. Chapman and requested a psycho-education evaluation, speech and language evaluation,

occupational therapy evaluation, and remedies, *see Exhibit 2*; (ii) Plaintiff wrote K.A.'s principal

and requested a psycho-education, speech and language evaluation, occupational therapy

evaluation, and remedies, *see Exhibit 3*; Plaintiff wrote Dr. Vitti, DPS superintendent and

requested a psycho-education evaluation, speech and language evaluation, occupational

therapy evaluation, and remedies, *see Exhibit 4*.  Defendants refused to evaluate K.A., and sent

Plaintiff a December 2, 2022 letter of official rejection. *See, Exhibit 5*.

**(a.)**     **Plaintiff Made On-Going Requests for Evaluations of K.A. Pursuant to *20 USC §
1414(a)(1)(B) and 34 CFR § 300.301(b)*, and those Requests were Ignored or Denied.**

31. K.A. was eligible for evaluations at Defendants' expense under the *IDEA's Child Find*

requirements. Defendants had Plaintiff's explicit consent to conduct evaluations. Plaintiff had

shared her observations of K.A.'s cognitive disabilities, and concern over low standardized test

scores. Defendants were obligated to conduct evaluations pursuant to *Child Find*.  *J.P. v.*

*Anchorage School District, 260 P.3d 285, 293 (Alaska 2011)*.

> When a school district receives a request that a child be
> evaluated for eligibility to receive special education services,
> and the district also receives parental consent to perform
> such an evaluation, the school district must conduct the
> necessary testing. *J.P. v. Anchorage School District,*
> 260 P.3d 285, 293 (Alaska 2011).

32. Plaintiff requested evaluations of K.A. and provided parental consent; in-turn, Defendants

were obligated to conduct the necessary testing. *J.P. v. Anchorage School District, 260 P.3d 285,*

*293 (Alaska 2011).*

**(b.)      Pursuant to** *20 USC § 1414(a)(1)(B) and 34 CFR § 300.301(b),* **the** *Child Find* **Obligation of Defendants was Triggered When Plaintiff Requested Evaluation of K.A. for Special Education Benefits.**

33. It is black letter law that a parent, state employee, or court official can trigger a special

educational evaluation of a child by requesting the school district to perform evaluation(s).  *See,*

*20 USC § 1414( a)(1)(B), 34 CFR § 300.301(b).*

*34.* Regarding federal *IDEA* regulations, the construction of a statute *(e.g., IDEA)* by the agency

charged with its administration is entitled to great deference. *Trafficante* v. *Metropolitan Life*

*Ins. Co.,* *409 U. S. 205, 210 (1972); Udall* v. *Tallman, 380 U.S. at 380 U. S. 16; Power Reactor Co.*

v. *Electricians, 367 U. S. 396, 408 (1961).* Therefore, Defendants were obligated to conduct

evaluations of K.A. in this case pursuant to the plain meaning of *20 USC § 1414(a)(1)(B) and 34*

*CFR § 300.301(b).*

35. The evaluation process may also be triggered when a parent or employee of another

state agency, such as a child welfare social worker or a juvenile delinquency system probation

officer, requests a special education evaluation.[3]

36. Plaintiff placed Defendants on direct notice that K.A. failed standardized tests, had

disabilities, required evaluations, and could not read and write.  In *Krawietz* v. *Galveston*

*Independent School District,* *900 F.3d 673, 676 (2018)* that court held:

---

[3] Cannon, Gregory, Waterstone, *"A Solution Hiding In Plain Sight: Special Education And Better Outcomes For Students With Social, Emotional Behavioral Challenges,"* 41 Fordham Urb. L.J. 403, 430 (2013).

> The *IDEA's Child Find* requirement obligated public school
> districts to identify, locate, and evaluate students with
> suspected disabilities" within a reasonable time after the
> school district is on notice of facts or behavior likely to
> indicate a disability." *Dallas Indep. Sch. Dist. v. Woody,*
> *865 F.3d. 303, 320 (5th Cir. 2017).*

37. Therefore, as a matter of law, Defendants were obligated to identify and evaluate K.A.

within a reasonable time after being placed on notice of her significant academic deficits, and

possible disability. *O.F. Ex Rel. N.S. v. Chester Upland School District, 246 F.Supp.2d 409, 417*

*(E.D. Pa. (2002).*

> IDEA's so called "*child-find*" duty includes a requirement
> that children who are suspected of having a qualifying
> disability must be identified and evaluated "within a
> reasonable time after school officials are on notice of
> behavior that is likely to indicate disability. *O.F. Ex Rel.*
> *N.S. v. Chester Upland School District, 246 F.Supp.2d 409,*
> *417 (E.D.Pa. (2002); also see, W.B. v. Matula, 67 F.3d*
> *484, 501 (3d Cir.1995).*

38. Here, *sub-judice*, the *IDEA* guarantees key *Child Find* and evaluation provisions which

Defendants have violated.

**(c.)    The Fact Defendants Passed K.A. From Grade to Grade Does not Relieve Defendants of
their *Child Find* Obligations.**

39. Defendants' second grade teacher Ms. Nancy Courtright testified that she passed K.A.

Next, Defendants' third grade reading and language teacher Ms. Jessica Chapman testified that

she passed K.A. Finally, Defendants' third grade mathematics teacher Ms. Melissa John testified

that she passed K.A.

40. Even where K.A. is passing from grade to grade, Defendants may not avoid their Child

Find obligations. The *IDEA's Child Find* provides the following in relevant part:

> 34 CFR § 300.111 (c)(1)
>
> (c) Other children in child find. *Child find* also must include—
>
> (1) Children who are suspected of being a child with a disability under §300.8 and in need of special education, even though they are advancing from grade to grade;

41. In *Independent School District No. 283* v. *E.M.D.H., 960 F.3d 1073, 1075 (8th Cir. 2022)*

that court found that even a student's above average intellectual abilities does not suspend a

school's *Child Find* obligations.

> . . . ;although school claimed student had above average Intellectual ability, its child find obligation was not suspended because of student's innate intelligence. *Independent School District No. 283* v. *E.M.D.H., 960 F.3d 1073, 1075 (8th Cir. 2022).*

42. The fact that Defendants teachers were passing K.A. from grade to grade, did not

suspend Defendants' *Child Find* obligations under the *IDEA*. A school District's *Child Find*

obligation is not suspended even where the student showed above-average intellect.

*Independent School District No.283* v. *E.M.D.H., 960 F.3d 1073, 1083 (8th Cir. 2022).*

**(d.)      Defendants had Suspicions of K.A.'s Disabilities from Kindergarten to Present, and was Obligated to Evaluate K.A. pursuant to *Child Find.***

43. Based upon Plaintiff's on-going complaints of K.A.'s inability to perform academically, and

K.A. abysmal performance on standardized tests for kindergarten, second grade, and third

grade, coupled with Plaintiff's disclosures that the child could not read nor write, that

sufficiently triggered *child find* obligations of Defendants prior to Plaintiff's letter of November

26, 2022. *See, Exhibits 2, 3, and 4.*

**(i)      *ALJ Smith's citation of 34 C.F.R. § 300.507(a)(2) and U.S.C. § 1415(f)(3)(C) is not a bar to Plaintiff's "Child Find" cause of action for K.A's first grade year of 2020-2021, second grade year of 2021-2022, and third grade year of 2022-2023.***

44. Here, *sub-judice,* Plaintiff sues for academic year 2020-2021, 2021-2022, and 2022-2023.

Plaintiff filed her administrative due process Complaint on December 13, 2022, which is timely

pursuant to *34 C.F.R. § 300.507(a)(2)*.

45. Pursuant to *34 CFR § 300.507(a)(2),* a "due process complaint must allege a violation

that occurred not more than two years before the date the parent or public agency knew or

should have known about the alleged action that forms the basis of the due process complaint."

Therefore, ALJ Smith's August 28, 2023 <u>*Decision and Order*</u> cannot legally exclude Defendants'

failure to comply with *"child-find"* as moot because of Plaintiff's failure to timely file regarding

K.A.'s first, second and third academic years. *See, Exhibit 1*

.

46. The *Child Find* mechanism is intended to provide early identification of children with

disabilities and provide them with special education benefits.  Scholars of this federal *Child Find*

mechanism write:

> The *Child Find* obligations and the resulting evaluation
> process provide mechanisms for early identification of
> children with disabilities and open the door for those
> children to receive an appropriate *IEP*.[4]

47. *Child Find* obligations of Defendants required evaluations of K.A. because Defendants were

aware of K.A.'s numerous suspected disability needs.

---

[4] See, Amy L. MacArdy, "Jamie S. v. Milwaukee Public Schools: Urban Challenges Cause System Violations of The IDEA," 92 Marq. L. Rev. 857, 857 (2009).  Also see, "A Solution Hiding In Plain Sight: Special Education And Better
Outcomes For Students With Social, Emotional Behavioral Challenges," 41 Fordham Urb. L.J. 403, 429 (2013).

### (ii)    *Congress intended K.A. to be timely evaluated and provided FAPE*

48. Congress intended young children like K.A. be identified quickly, and provided services. In

the Congressional Record of the 94th Congress, Senator Harrison Walker stated:

> . . . I cannot emphasize enough that delay in resolving matters
> regarding the education program of a handicapped child is
> extremely detrimental to his development.  The interruption
> or lack of the required special education and related services
> can result in a substantial setback to the child's development.
> *See,* U.S. Congressional Record, 94th Congress, 1st Session,
> *Vol. 121-Part 29, p. 37416 (Nov. 18th – Dec. 2nd 1975).*

49. In <u>Spiegler</u> v. <u>District of Columbia</u>, 866 F.2d 461, 467 (D.C. Cir. 1989), (citing 121 Cong.

Rec. 37,416 (1975) (statement of Sen. Williams)), that court also acknowledged that Congress

"intended to ensure prompt resolution of disputes regarding appropriate education for

handicapped children."

50. Federal courts have taken judicial notice of the intent of Congress by citation of Senator

Williams' above speech from the Congressional Record. In <u>Herbin</u> v. <u>District of Columbia,</u> 362

F.Supp.2d 254, 260 (2005) that court cited Senator Williams' speech from the Congressional

Record, and went on to find that the plain meaning of *IDEA* defined rights and obligations.

51. Here, *sub-judice*, K.A.'s *IDEA* rights are defined by *inter-alia*: (a) Initial evaluations rights

pursuant to *20 U.S.C. § 1414((a)(1)(B) and 34 CFR § 300.301(b)*; (b) *"Child Find"* rights pursuant

to *34 CFR 300.111*; (c) Production of all Hearing and Pre-Hearing Transcripts gratis pursuant to

*34 CFR § 300.512*; (d) compensatory education, *see,* <u>Board of Education of Fayette County</u> v.

<u>L.M.,</u> 478 F.3d 307, 316 (6th Cir. 2007); (e) Evaluation of K.A. for necessary assistive technology

pursuant to *34 CFR § 300.105*; and, (f) Provide K.A. necessary *ESY, see* <u>Colchester School District,</u>

*30 IDELR 221, 224 (1999).*

52. The plain meaning of the *IDEA* as interpreted in *Herbin v. District of Columbia, Id.* (*expression unius est exclusio alterius*), shows Congress intended Plaintiff to prevail *sub-judice*. This case at bar is simple and straightforward, therefore the ALJ committed reversible error.

**(e.)      Defendants were fully aware of K.A.'s years of Failures of the Michigan Standardized Examinations, and Failed to Executed their *"Child Find"* Obligations.**

53. When did Defendants first become aware of K.A.'s abysmal performance on the Michigan standardized examinations. Defendants were aware of K.A.'s failed standardized Michigan mathematics and reading scores as early as kindergarten.  Everyone was aware of K.A.'s standardized tests failures for kindergarten. It was not necessary for Plaintiff to tell Defendants what they already knew. Defendants knew K.A. failed all standardized tests in kindergarten even before Plaintiff.

54. Defendants were aware of K.A.'s failed standardized Michigan mathematics and reading scores for second grade. Defendants were aware of K.A.'s standardized tests failures for second grade. It was not necessary for Plaintiff to tell Defendants what they already knew. Defendants knew K.A. failed standardized tests in second grade before Plaintiff.

55. Defendants were aware of K.A.'s failed standardized Michigan mathematics and reading scores for third grade. Defendants were aware of K.A.'s standardized tests failures for third grade. It was not necessary for Plaintiff to tell Defendants what they already knew. Defendants knew K.A. failed standardized tests in third grade before Plaintiff.

**(ALLEGATION-2) ALJ SMITH'S FINDING OF FACT THAT DPS CONTACTED PLAINTIFF AND CONSENTED TO PERFORM EVALUATIONS IS FALSE, MISLEADING, AND NOT CORRECT.**

**(a)      Plaintiff made on-going Requests for Evaluations of K.A. Pursuant to *20 USC § 1414(a)(1)(B) and 34 CFR § 300.301(b),* and those Requests were Ignored or Denied. *See,* Exhibits 2, 3, and 4.**

56. Plaintiff's notice to Defendants of K.A.'s deficiencies coupled with low standardized

mathematics and reading scores raised reasonable suspicions of disabilities, and obligated

Defendants to evaluate K.A. as early as kindergarten pursuant to *Child Find*.  Regarding

suspicions of disabilities and when a school district must act regarding *Child Find, D.G.* v. *Flour*

*Bluff Independent School District,* 832 F.Supp.2d 755, 764 (S.D. Tex. 2011) held:

> The Child Find duty is triggered when the local educational agency
> has reason to suspect a disability coupled with reason to suspect
> that special education services may be needed to address that
> disability.  When these suspicions arise, the local educational
> agency "must evaluate the student within a reasonable time after
> school officials have notice of behavior likely to indicate a disability."
> *El Paso ISD* v. *Richard R., 567 F.Supp.2d 918, 950 (W.D.Tex. 2008).*

57. Here, *sub-judice*, Defendants had or should have had reasonable suspicions of K.A.'s

disabilities as early as Kindergarten and did nothing.  Defendants were legally obligated to

evaluate K.A. for suspected special education needs pursuant to *Child Find*. This failure violated

the law.

58. First, the record shows that Petitioner made numerous efforts to get Defendants to evaluate

K.A. *See, Exhibits 2, 3, and 4.* They refused to evaluate K.A., then finally rejected Plaintiff by a

December 2, 2022 document sent to Plaintiff. *See, Exhibit 5.*  The December 2, 2022 document

from Defendants which rejected evaluations for K.A. is a part of the administrative record, and is

a *bon-fide* government record. There is no record in evidence that Defendants offered to evaluate K.A.

(i) *There is no documentary evidence within the Administrative Record that Shows Defendants Contacting Plaintiff and Consenting to Perform Evaluations on K.A. Therefore, ALJ Smith's Finding of Fact that Defendants Contacted Plaintiffs and Offered to Perform Evaluations is not Based on Documentary Evidence from the Administrative Record, and is Reversible Error.*

59. Absent documentary evidence from the administrative record to substantiate Defendants' alleged offer to evaluate K.A., ALJ Smith finds the existence of an offer to evaluate K.A. based on Defendants' alleged phone calls that Plaintiff never received. Moreover, Defendants have no business log of ever making any calls to Plaintiff offering evaluations of K.A.  ALJ Smith writes the following for his finding of fact on this issue:

> On at least two occasions in December of 2022, after the scheduled meeting that Petitioner did not attend, Ms. Sheppard-Bonner called Petitioner on the telephone and spoke to her about Respondent evaluating Student and about the Individualized Education Program *(IEP)* process. Ms. Sheppard-Bonner explained that Respondent would be willing to conduct the evaluations as soon as Petitioner signed the necessary consent form. Petitioner twice indicated that she would come to the school to sign the consent form, but she never did so.  *See, Exhibit 1, pp. 15-16, ¶ 32.*

60. There is not one document in the administrative record, or the mere *scintilla* of documentary evidence from the record in evidence, that suggests Defendants telephoned Plaintiffs and offered K.A. evaluations.

61. There are no school phone logs that a DPS's teacher telephoned Plaintiff twice and offered K.A. evaluations. Indeed, no phone logs memorializing the alleged phone calls from DPS to Plaintiff were submitted for admission into evidence by Defendants because they do not exist.

These alleged calls of DPS never took place.

62. There is no documentary evidence neither of phone logs or other business records

from DPS that show that Plaintiff was offered evaluation(s) of K.A. because there was **never** any

offer to evaluate K.A. made by Defendants. Hence, ALJ Smith's finding of fact that DPS offered

to evaluate K.A. and contacted Plaintiff is not based on documentary evidence nor business

record(s) to verify any phone calls. ALJ Smith's finding is not supportable.

### (ii) *Any Settlement from Defendants came after Plaintiff Hired Counsel and/or Filing of a Complaint.*

63. On December 2, 2022 Defendants denied Plaintiff's request for evaluation of K.A. *See,*

*Exhibit 5.* On December 9, 2022 Plaintiff and her attorney mailed Defendants two USPS Certified

Mail Complaints. Plaintiff and her attorney both signed the two Complaints.

**(ALLEGATION-3) DEFENDANTS WERE AWARE THAT PLAINTIFF HAD RETAINED A LAWYER, AND WERE OBLIGATED TO COMMUNICATE WITH SAID COUNSEL PURSUANT TO *ABA RULE 4.2 - COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL AND MICH. R. EVID. 408 - COMPROMISE AND OFFERS TO COMPROMISE.***

64. Plaintiff testified on cross-examination that her lawyer helped her draft three November 26,

2022 letters to Defendants requesting evaluations for K.A. *See Exhibits 2, 3, and 4.* On December

2, 2022 Defendants denied Plaintiff's request for evaluation of K.A. *See, Exhibit 5.* When Plaintiff

received Defendants' December 2, 2022 rejection letter, she realized that all her many efforts

for help for K.A. had fallen on deaf ears as her clear communication that she was now

represented by legal counsel.

65. Plaintiff's counsel **never** received a December 12, 2022 offer from Defendants to evaluate

K.A. Moreover, Plaintiff never received a written or telephone offer to evaluate K.A.

66. Any offer to evaluate K.A. should have been provided Plaintiff's counsel pursuant to *ABA*

*Rule 4.2 - Communication With Person Represented By Counsel and Mich. R. Evid. 408 –*

*Compromise and Offers to Compromise.*

**(i.)** *ALJ Smith's finding of fact that Defendants did not Learn of Plaintiff's Retained Counsel until Shortly after a Schedule Meeting is not Correct. Plaintiff Immediately told Defendants she had an Attorney in a call Immediately Following Defendants Receipt of Plaintiff's November 26, 2022 Demand Letter.*

67. Plaintiff testified that she disclosed to Defendants that she had an attorney. At **no** time did

Plaintiff, conceal or have reason to conceal that she had an attorney. Although Defendants knew

Plaintiff had counsel, nevertheless they continued to exclude her attorney from all

communications in violation of ethics.

68. ALJ Smith's finding of fact that DPS learned of Plaintiff's counsel "shortly after the scheduled

meeting" is misleading, factual incorrect, ignores testimony of Plaintiff, and is not supported by

documentary evidence in the record.  ALJ Smith writes the following for his finding of fact on

this issue:

> Sometime shortly after the scheduled meeting, Respondent
> learned Petitioner had retained a lawyer to represent her with
> respect to her request for special education services for
> Student. *See, Exhibit 1, p. 14, ¶ 31.*

69. Defendants knew of Plaintiff's retained counsel contemporaneously to reception of her

November 26, 2022 demand letter because she told them she had a lawyer. Plaintiff even

testified that her lawyer helped her write the three November 26, 2022 letters to Defendants.

70. Plaintiff is a lay-person, with no legal experience and sought the legitimate help of an attorney to help her fight for K.A.'s rights. Again, there was no reason for Plaintiff to conceal the fact she had an attorney from Defendants. **Here, *sub-judice*, Defendants attempted the exploitation of a mother's naivety which was unconscionable.**

**(ALLEGATION-4) ALJ SMITH'S FINDING OF FACT THAT PLAINTIFF FAILED TO PROVIDE DEFENDANTS CONSENT TO CONDUCT EVALUATIONS OF K.A. IS NEITHER SUPPORTED BY DOCUMENTARY EVIDENCE IN THE RECORD, NOR REASON, OR LOGIC.**

71. Plaintiff testified to her years of oral requests for evaluation(s) and help for K.A. The best evidence that Plaintiff consented to evaluation for her daughter is found in three detailed letters to: (i.) K.A.'s teacher; (ii.) K.A.'s principal; and, (iii.) the superintendent of DPS schools. *See, Exhibits 2, 3, and 4.* These three business records demanded and consented to DPS doing: psycho-educational evaluation; speech and language evaluation; occupational therapy evaluation; and, remedies.

72. ALJ Smith's finding of fact that Plaintiff failed to provide Defendants' consent to conduct evaluations stated:

> Petitioner has not provided her consent for Respondent to conduct a comprehensive evaluation of Student (Testimony of Petitioner; Testimony of Ms. Sheppard-Bonner). *See, Exhibit 1, p. 15, ¶ 33.*

73. The above finding of fact by ALJ-Smith is rebutted by the documentary evidence in the record, and flies in the face of reason.

**(ALLEGATION-5) AS A MATTER OF LAW DEFENDANTS ARE NOT EXCUSED FROM *CHILD FIND* OBLIGATIONS BY THE ABSENCE OF PLAINTIFF'S CONSENT.**

74. Assuming *arguendo* that Plaintiff did not make requests for evaluations of K.A. armed with

standardized test results, nevertheless Defendants are not excused from their *Child Find*

obligations. Pursuant to *20 USC § 1412(a)(3)(A)* Defendants were obligated to identify K.A.,

evaluate her, and determine her special education needs.  Where a parent refuses consent for

evaluation(s) of their child, the school district is still obligated to execute their *Child Find*

obligations pursuant to *20 USC § 1414(a)(1)(D)(ii)(I)* absent parental consent.  The *IDEA* at *20*

*USC § 1414(a)(1)(D)(ii)(I)* provides:

> (ii) Absence of consent
>
>> (I) For initial evaluation
>> If the parent of such child does not provide consent for an
>> initial evaluation under clause (i)(I), or the parent fails to
>> respond to a request to provide the consent, the local
>> educational agency may pursue the initial evaluation of the
>> child by utilizing the procedures described in section 1415
>> of this title, except to the extent inconsistent with State law
>> relating to such parental consent.

75. As a matter of law, *Child Find* obligations of a District to conduct evaluations trumps a

parent's refusal to consent. *Northridge Independent School District*, *42 IDELR 95 (2004)*; *also*

*see, 20 USC § 1414(a)(1)(D)(ii)(I)*.  *Northridge Independent School District*, *42 IDELR 95 (2004)*

held:

> The IHO determined the district had an unconditional legal right
> to conduct a full, individual evaluation of a fifth-grade student
> despite the parent's failure to consent to the evaluation. *Northridge*
> *Independent School District*, *42 IDELR 95 (2004)*.

76. *Independent School District No. 283* v. *E.M.D.H.*, *960 F.3d 1073, 1075 (8th Cir.2020)* held:

> . . . and school's duty to identify student as disabled was
> not excused because parents had not yet requested an

evaluation of their child. *Independent School District No. 283* v. *E.M.D.H.*, *Id.*

77. Moreover, it is a fundamental rule of *IDEA* that the school district must take affirmative steps to initiate the special education process irregardless of parental request or notification.

> the *Child Find* obligation requires school districts to take affirmative steps to initiate the special education evaluation process for any child who might require services, regardless of parental request or notification.

78. Therefore, Defendants were legally obligated to execute evaluations of K.A. even where Plaintiffs failed to consent. *See, Northridge Independent School District*, 42 IDELR 95 (2004); also see, *Independent School District No. 283* v. *E.M.D.H.*, 960 F.3d 1073, 1075 (8th Cir.2020); and, *20 USC § 1414(a)(1)(D)(ii)(I)*.

### (i)   Absence of Parental Consent for an Initial Evaluation of K.A. did not Absolve Defendants' Child Find Obligations and Providing K.A. FAPE.

79. Although a parent can refer a child to the school District for special education evaluation as Plaintiff did in the case at bar, still the absence of parental consent for initial evaluation does not absolve Defendants from *Child Find* obligations.

> However, under *the IDEA'S child find* obligation, schools must proactively initiate a referral for evaluation even if it is not requested by the parents.[5]

### (ii)   Pursuant to 20 USC § 1412(a)(3), Child Find Obligated Defendants to Initiate Affirmative Steps to Evaluate K.A. for Special Education Services Even Absent Plaintiff's Requests.

80. The *IDEA* guarantees key *Child Find* and evaluation provisions.  While K.A.'s parents and

---

[5] Grant, Crystal, *"Special Education by Zip Code: Creating Equitable Child Find Policies,"* 52 Loyola University Chicago Law Journal 127, at 151 (2020).

certain officials may refer her for special education, *20 USC § 1414(a)(1)(B) (2012)*, *Child Find*

required Defendants to initiate the special education process regardless of parental request or

notification. *See, 20 USC § 1412(a)(3)*.

> While parents and certain other individuals enumerated
> in the *IDEA* may certainly refer a child for special education,
> the *Child Find* obligation requires school districts to take
> affirmative steps to initiate the special education evaluation
> process for any child who might require services, regardless
> of parental request or notification.[6]

81. Even if Plaintiff failed to request evaluation(s) of K.A., as a matter of law Defendants were

still obligated pursuant to *Child Find* to take affirmative steps to determine whether K.A.

required special education based upon years of failing standardized test scores and Petitioner's

inquiries of reasonable suspicion of deficits. Plaintiff generated reasonable suspicion of K.A.'s

need for evaluation(s) and special education. *Independent School District No. 283* v. *E.M.D.H.,*

*960 F.3d 1073, 1075 (8th Cir.2020)* held:

> . . . and school's duty to identify student as disabled was
> not excused because parents had not yet requested an
> evaluation of their child. *Independent School District*
> *No. 283* v. *E.M.D.H., Id.*

82. In the case at bar, Defendants were fully aware of K.A. 's academic and cognitive disabilities

*via* years of failed standardized Michigan examinations, and Plaintiff's disclosures. Therefore,

pursuant to *Mobile County Public School System, 25 IDELR 893 (1997)* Defendants' failure to

initiate evaluations of K.A. violated the *IDEA; also see, Spring Branch Independent School District*

---

[6] See, Cannon, Gregory, Waterstone, *"A Solution Hiding In Plain Sight: Special Education And Better Outcomes For Student Social, Emotional Behavioral Challenges,"* 41 Fordham Urb. L.J. 403, 429 (2013).

v. _O.W_, _et al_, 938 F.3d 695, 704 (5th Cir. 2019).

**(ALLEGATION-6) ALJ SMITH'S FINDING THAT THE PARENT LACKED CREDIBILITY WAS <u>NOT</u> BASED ON EVIDENCE, CHARACTER, IMPEACHMENT, OR VERICITY.**

83. Absent citation of any evidence, ALJ Smith wrote in his August 28, 2023 **<u>Decision and Order</u>**

that K.A.'s mother (Plaintiff) was not credible. ALJ Smith's precise words were the following:

> As an initial matter, the undersigned ALJ finds that Petitioner's testimony was not credible. _See, Exhibit 1, p. 16, ¶ 2._

84. ALJ Smith goes on to incorrectly write in his August 28, 2023 **<u>Decision and Order</u>** the

following:

> In any event, apart from the veracity of Petitioner's testimony about Student's struggles at home, there is no credible evidence in the record that Petitioner ever relayed this information to any teachers or administrators at Student's school. _See, Exhibit 1, p. 16, ¶ 3._

85. ALJ Smith's statement about the mother's veracity and whether she ever told Defendants'

about K.A.'s struggles and need for evaluation is rebutted by the three November 26, 2022

letters sent to: (i) the teacher; (ii) the principal; and, (iii) the superintendent of DPS. _See,_

_Exhibits 2-4._ Therefore, the documentary evidence in the record proves ALJ Smith as wrong.

86. ALJ Smith's conclusion that the mother is not credible is not based on objective standards of

evidence. No where in the record is there evidence of the mother being a felon, perjurer,

incompetent, ignorant, making inconsistent statements, or even disrespectful. The mother even

testified that she attended PTA meeting.

87. The mother (Plaintiff) merely testified that her child (K.A.) cannot read or write, needs,

evaluations and special educations, and asked Defendants for help.  She never cursed, nor lied, and intelligently answered all questions.

(i)     *According to Special Education Treatises, Plaintiff is a Genuine Parental Advocate.*

88. Plaintiff is an indigent, mixed-race Detroit mother of four Black children who wanted them to receive an education, and presented such at the administrative Hearing.

89. The administrative record shows that Plaintiff is a parental advocate for K.A.  Relative to parental advocacy and the special education need(s) of children, Dr. Marquis C. Grant writes compellingly about the parental role in a child's educational life:

> Advocacy for children is very important. Parents are a child's
> first and best advocates, bringing special knowledge and expertise
> to the academic environment, which should be encouraged and
> respected. Yet, when it comes to the nuances of education, parents
> often perceive themselves to be outsiders when it comes to their
> child's academics. Research supports family and parent engagement
> as being paramount in the academic success of students. In fact,
> data shows that 86% of the general public believes that school
> improvement depends heavily on support from parents. Lack of
> parental involvement is the biggest problem facing public schools.[7]

90. K.A. is now in fourth grade and has been denied *FAPE* since kindergarten.  As K.A. passes through grades, she loses precious time to remedy her disabilities and may never catch-up. Dr. Grant writes:

> As a child matriculates through his educational careers, parent
> support declines considerably from each year to the next; by the
> time a student reaches high school, parent involvement is typically
> non-existent. But if parents have a central role in influencing their
> children's progress in school, research has shown that schools in
> turn have an important part to play in determining levels of parent

---

[7] Dr. Marquis C. Grant, Grand Canyon University. *"Empowering Parents in the Special Education Process."* *National Association of Special Education Teachers.* www.naset.org

involvement. Recent research indicates that family resistance to school involvement can be reversed.[8]

91. Pursuant to independent professional special education treatises, Plaintiff's advocacy for a *FAPE* for K.A. is a good thing for the child and her school.

### (ii)     ALJ Smith's Finding that Plaintiff (mother) Lacked Credibility was Based on Racial and Gender Bias in Violation of Plaintiff's Fourteenth Amendment Rights to the U.S. Constitution.

92. Where Plaintiff's advocacy is a good thing for both K.A. and her school, and there is absolutely **no** evidence to impeach Plaintiff, why does ALJ Smith say that this mother is not credible? Would ALJ Paul Smith have found Plaintiff credible if she was a white man?  Would ALJ Smith have found Plaintiff credible if she was a white female? Is this mother less credible because she is an indigent inner-city mother of four Black children working legally to secure *FAPE* for her children?

93. ALJ Smith's determination that this mother lacked credibility was **not** based on evidence from the record, but on gender and racial prejudice; and, as such his prejudicial ruling violated Plaintiff's Fourteenth Amendment rights to the U.S. Constitution. The burden is now upon Defendants to prove that ALJ Smith's finding that Plaintiff lacked credibility did not stem from racial bias and/or gender prejudice in violation of the Fourteenth Amendment.

**(ALLEGATION-7) ALJ SMITH'S STATISTICAL INTREPRETATION OF K.A.'S STANDARDIZED EXAMINATION SCORES ARE MISLEADING, AND PAINT A FALSE PICTURE IN CONTRASS TO UNASSAILABLE DATA THAT K.A. IS VERY FAR BEHIND.**

94. ALJ Smith uses "blue smoke and mirrors" in an attempt to deceive us into seeing a false

---

[8] *Id.*

impression that K.A. standardized tests are fine because of improvements. However, in every

standardized test K.A. is behind overall. ALJ Smith's analysis of K.A.'s standardized tests scores

are misleading, and are **not full** disclosures. ALJ Smith writes the following misleading, and

limited information:

> For the subject of reading, for her second-grade year, Student showed 264% growth from the beginning of the school year to the end of the school year, improving from a "Grade K" level to an "Early 2" level.
>
> For the subject of math, for her second-grade year, Student showed 390% growth from the beginning of the school year to the end of the school year, improving from a "Grade K" level to a "Grade 1" level.
> For the subject of reading, for her third-grade year, Student showed 39% growth from the beginning of the school year to the middle of the school year, improving from a "Grade K" level to a "Grade 1" level.
>
> For the subject of math, for her third-grade year, Student showed 190% growth from the beginning of the school year to the middle of the school year, improving from a "Grade K" level to a "Grade 2" level (Exhibit E, p 5). Student's growth from the beginning to the middle of the year on her third-grade math i-Ready test was the highest of any student in her class. *See, Exhibit 1, pp. 11-12, ¶¶ 6-9.*

95. The best evidence for K.A.'s performance on standardized tests come from full and complete

disclosures of all evaluation information. K.A.'s most recent standardized test results for

third-grade mathematics scores found the following, and stated in bold print:

> **This student will likely need to meet or exceed their Annal Stretch Growth target for at least 3 years to be proficient if the student is not proficient already. This is based on students with the same baseline placement who eventually achieved proficiency. Proficient for Grade 3 is a Mid On-Grade Level scale score of 464.** *See. Exhibit 6.*

96. Chart 1 shows K.A.'s overall math diagnostic growth, grade 3, *via* i-Ready standardized

examination as:



Overall Diagnostic Growth

— Mid On Grade Level (464)
On Grade Level (449 - 516)

Key
- Mid or Above Grade Level
- Early On Grade Level
  One Grade Level Below
- Two Grade Levels Below
- Three or More Grade Levels Below

460

Stretch 441 +57

Typical 416

340

Diagnostic 1†
386
Grade K
09/20/22

Diagnostic 2
443
Grade 2
12/13/22

†This Diagnostic is considered the baseline and is used to establish
Growth Measures for this student.

97. Chart 2 shows K.A.'s math placement by domain, grade 3, *via* i-Ready standardized

examination as the following:

Placement by Domain

| Domain | Diagnostic 1 | Diagnostic 2 |
|---|---|---|
| Overall ⇧ | Grade K | Grade 2 |
| Number and Operations ⇧ | Grade K | Mid 3 |
| Algebra and Algebraic Thinking ⇧ | Grade 1 | Early 3 |
| Measurement and Data | Grade 2 | Grade 2 |
| Geometry ⇧ | Grade K | Grade 2 |

⇧ Placement Improved from Baseline

98. K.A.'s full standardized examination mathematics scores, 3 grade, i-Ready show her significantly behind.

99. K.A.'s most recent standardized test results for third-grade reading scores found the following and stated in bold print:

> **This student will likely need to meet or exceed their Annal Stretch Growth target for at least 3 years to be proficient if the student is not proficient already. This is based on students with the same baseline placement who eventually achieved proficiency. Proficient for Grade 3 is a Mid On-Grade Level scale score of 545.** *See. Exhibit 7.*

100.   Chart 3 shows K.A.'s overall reading diagnostic growth, grade 3, via i-Ready standardized examination as:



101.    Chart 4 shows K.A.'s reading placement by domain, grade 3, via i-Ready standardized

examination as the following:

**Placement by Domain**

Key
- Mid or Above Grade Level
- Early On Grade Level
- One Grade Level Below
- Two Grade Levels Below
- Three or More Grade Levels Below

| Domain | Diagnostic 1 | Diagnostic 2 |
|---|---|---|
| Overall ⇧ | Grade K | Grade 1 |
| Phonological Awareness* | Tested Out | Tested Out |
| Phonics* | Grade K | Grade K |
| High-Frequency Words* ⇧ | Grade K | Grade 1 |
| Vocabulary | Grade 1 | Grade 1 |
| Comprehension: Literature | Grade 1 | Grade 1 |
| Comprehension: Informational Text ⇧ | Grade K | Grade 1 |

⇧ Placement Improved from Baseline
* Foundational Domains

102.    K.A.'s full standardized examination reading scores, 3 grade, i-Ready show her

significantly behind.

103.   K.A.'s standardized test results for second-grade mathematics scores found the following and stated in bold print:

> **This student will likely need to meet or exceed their Annal Stretch Growth target for at least 2 years to be proficient if the student is not proficient already. This is based on students with the same baseline placement who eventually achieved proficiency. Proficient for Grade 2 is a Mid On-Grade Level scale score of 441.** *See. Exhibit 9.*

104.   Chart 5 shows K.A.'s overall mathematics diagnostic growth, grade 2, via i-Ready standardized examination as:





†This Diagnostic is considered the baseline and is used to establish Growth Measures for this student.

105.    Chart 6 shows K.A.'s mathematics placement by domain, grade 2, via i-Ready

standardized examination as the following:

Key

Ø Mid or Above Grade Level
O Early On Grade Level
⁚ One Grade Level Below
⊘ Two Grade Levels Below
⊗ Three or More Grade Levels Below

### Placement by Domain

| Domain | Diagnostic 1 | Diagnostic 2 | Diagnostic 3 |
|---|---|---|---|
| Overall ⇧ | ⊘ Grade K | ⊗ Grade K | ⁚ Grade 1 |
| Number and Operations ⇧ | ⊗ Grade K | ⊗ Grade K | ⊗ Early 2 |
| Algebra and Algebraic Thinking ⇧ | ☺ Grade K | ⊘ Grade K | ⁚ Grade 1 |
| Measurement and Data ⇧ | ☺ Grade K | ⊘ Grade K | ⊘ Grade 1 |
| Geometry ⇧ | ⊗ Grade K | ⁚ Grade 1 | ⁚ Grade 1 |

⇧ Placement Improved from Baseline

106.    K.A.'s standardized test results for second-grade reading scores found the following and

stated in bold print:

> **This student will likely need to meet or exceed their Annal Stretch Growth target for at least 2 years to be proficient if the student is not proficient already. This is based on students with the same baseline placement who eventually achieved proficiency. Proficient for Grade 2 is a Mid On-Grade Level scale score of 513.** *See. Exhibit 8.*

41

107.    Chart 7 shows K.A.'s overall reading diagnostic growth, grade 2, via i-Ready standardized

examination as:



†This Diagnostic is considered the baseline and is used to establish Growth Measures for this student.

108.    Chart 8 shows K.A.'s reading placement by domain, grade 2, via i-Ready standardized

examination as the following:

Key
⊘ Mid or Above Grade Level
⊙ Early On Grade Level
⁃ᐧ One Grade Level Below
⊝ Two Grade Levels Below
⦸ Three or More Grade Levels Below

**Placement by Domain**

| Domain | Diagnostic 1 | Diagnostic 2 | Diagnostic 3 |
|---|---|---|---|
| Overall ⇧ | ⊙ Grade K | ⊙ Grade K | ⊙ Early 2 |
| Phonological Awareness* ⇧ | ⊙ Grade K | ⊘ Grade K | ⊘ Tested Out |
| Phonics* ⇧ | ⊙ Grade K | ⊙ Grade K | ⊘ Max Score |
| High-Frequency Words* | ⊙ Grade K | ⊙ Grade K | ⊙ Grade K |
| Vocabulary ⇧ | ⁃ᐧ Grade 1 | ⊙ Grade K | ⊘ Grade 3 |
| Comprehension: Literature ⇧ | ⊙ Grade K | ⊙ Grade K | ⊙ Early 2 |
| Comprehension: Informational Text ⇧ | ⁃ᐧ Grade 1 | ⊙ Grade K | ⊙ Early 2 |

⇧ Placement Improved from Baseline
* Foundational Domains

42

109.    K.A.'s full standardized examination reading scores, 2 grade, i-Ready show her significantly behind.

110.    Chart 9 shows K.A.'s standardized test results for kindergarten mathematics scores as the following:

| Domain | Test (09/12/19) | Test (01/21/20) |
|---|---|---|
| Overall | Approaching Grade K | Approaching Grade K |
| Number and Operations | Approaching Grade K | Approaching Grade K |
| Algebra and Algebraic Thinking | Approaching Grade K | Approaching Grade K |
| Measurement and Data | Approaching Grade K | Approaching Grade K |
| Geometry | Approaching Grade K | At Grade K |

390

On Grade Level (362 – 454)

322

270

| | Test (09/12/19) | Test (01/21/20) |
|---|---|---|
| Scale Score | 310 | 332 |
| Placement | Approaching Grade K | Approaching Grade K |

111.    K.A.'s full standardized examination mathematics scores, kindergarten, i-Ready show her significantly behind.

112.    Chart 10 shows K.A.'s standardized test results for kindergarten reading scores as the following:

| | On Grade Level (362-479) | Domain | Test (09/13/19) | Test (01/15/20) |
|---|---|---|---|---|
| 420 | | **Overall** | Approaching Grade K | At Grade K |
| | | Phonological Awareness* | Approaching Grade K | At Grade K |
| | | Phonics* | At Grade K | Above Grade K |
| | | High-Frequency Words* | Approaching Grade K | Approaching Grade K |
| | 327 | Vocabulary | Approaching Grade K | Approaching Grade K |
| | | Comprehension: Literature | Approaching Grade K | Approaching Grade K |
| 300 | | Comprehension: Informational Text | Approaching Grade K | Approaching Grade K |
| | Test (09/13/19) | Test (01/15/20) | | * Foundational Domains |
| Scale Score | 341 | 368 | | |
| Placement | Approaching Grade K | At Grade K | | |

113.    K.A.'s full standardized examination reading scores, kindergarten, i-Ready show her

significantly behind.  *Also see Exhibit 11.*

114.    Analytical analysis of all K.A.'s standardized examinations for third grade, second grade,

and kindergarten show her substantially behind by years, and never catching up to grade level.

**(ALLEGATION-8) DEFENDANTS' FAILURE TO EXECUTE NECESSARY, AND PROPER EVALUATIONS OF K.A. DENIED HER A *FAPE*.**

**(a.)    The Record Supports the Conclusion that Defendants violated the *IDEA* by Failure to Conduct a Psycho-educational Evaluation with a Woodcock – Johnson II Test on K.A.**

115.    Years of standardized test records show K.A. significantly behind in all academic

disciplines.  Years of Plaintiff's on-going requests for help and evaluations of K.A. put Defendants

on notice that K.A. was a student with suspected disabilities.  A psycho-educational evaluation is

the proper vehicle to asses K.A.'s disabilities, abilities, needs, and recommendations for an IEP.

> A psycho-educational evaluation is a comprehensive
> assessment of a student's cognitive, academic, and socio-
> emotional functioning. These evaluations are used to
> determine if a student is eligible for special education.
> Additionally, psycho-educational evaluations inform the
> delivery and type of related services your student will receive.
> Psycho-educational evaluations are usually standardized. This
> means that the student's scores are compared to typical
> students of the same age and gender.[9]

116.    A psych-educational evaluation will execute achievement tests in reading, mathematics,

and writing, including the Woodcock – Johnson II Test of Achievement.[10]  Here, *sub-judice*, it is

necessary and proper for Defendants to conduct a psycho-educational coupled with a

---

[9] *"Understanding Psycho-Educational Evaluations"* Disability Rights California (May 1, 2023).
https://www.disabilityrightsca.org/publications/understanding-psycho-educational-evaluations
[10] *Id.*

Woodcock – Johnson II Test. *See, J.P. v. Anchorage School District, 260 P.3d 285, 293 (Alaska 2011).*

**(b.)     The Record Supports a Conclusion That Defendants Violated the *IDEA* by Failure to Conduct the Weschler Intelligence Scale for Children Evaluation on K.A.**

117.     During K.A.'s entire academic career she has shown significant intellectual disabilities, and Defendants were aware (or should have been aware) of these deficits. Plaintiff testified that although K.A. is in the third grade she cannot read premier (elementary) books.  Now this child is in the fourth grade, and falling further behind. When are Defendants required to evaluate this poor child.

> Thus, a school district must "identify, locate, and evaluate students with suspected disabilities within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability." *Krawietz ex rel. Parker v. Galveston Independent School District, 900 F.3d 673, 676 (5th Cir. 2018).*

118.     The Weschler Intelligence Scale for Children evaluation will address K.A.'s general thinking and reasoning skills.  The Weschler Intelligence Scale for Children evaluates five main scores: Verbal Comprehension score, Perceptual Reasoning score, Working Memory score, Processing Speed score, and Full-Scale score.

119.     Here, *sub-judice*, it is necessary and proper for Defendants to conduct a Weschler Intelligence Scale for evaluation of K.A.'s general thinking and reasoning skills. *See, J.P. v. Anchorage School District, 260 P.3d 285, 293 (Alaska 2011).*

**(c.)   The Record Supports a Conclusion That Defendants Violated the *IDEA* by Failure to Conduct an Occupational Therapy Evaluation on K.A. Regarding Handwriting Issues.**

120.   K.A.'s second grade teacher Ms. Courtright testified that K.A.'s handwriting was very messy for second grade.  Plaintiff has constantly stated to Defendants that K.A. needs help in all areas.

121.   Third grade teacher Ms. Chapman testified that K.A. drew very large letters when writing, and she failed to put space between words. Today K.A. is still behind in this area, and is falling further behind.

122.   Here, *sub-judice*, it is necessary and proper for Defendants to conduct an occupational therapy evaluation regarding K.A.'s handwriting to ascertain her deficiencies and needs in that area. See, *J.P. v. Anchorage School District,* 260 P.3d 285, 293 (Alaska 2011).

**(d.)   The Record Supports a Conclusion That Defendant Violated the *IDEA* by Failure to Conduct a Speech and Language Evaluation on K.A.**

123.   Plaintiff-mother testified that K.A.'s biological brother has severe autism and is non-verbal. Therefore, it is necessary and proper for Defendants to execute a speech and language evaluation on K.A. to determine if she is on the spectrum.

**(ALLEGATION-9) THIS COURT HAS AUTHORITY TO COMPEL THE GOVERNMENT TO PROVIDE PLAINTIFFS COMPLETE COPIES OF ALL HEARING AND PRE-HEARING TRANSCRIPTS PURSUANT TO *34 CFR § 300.512(C)(3)* AT NO CHARGE**

124.   Preliminary Hearing on Summary Judgment, other matters, and Hearings were held on: February 7th, February 16th, May 12th, May 22nd, May 23rd, and May 24th. The indigent Plaintiffs requested gratis copies of all transcripts pursuant to *34 CFR § 300.512(C)(3)* in compliance with

federal law.  The State provided transcripts for May 22nd, May 23rd, and May 24th gratis, but

refused to provide pre- hearing transcripts for February 7th, February 16th, and May 12th at no-

charge to Plaintiff.

125.    Plaintiffs requires all transcripts without charge to fully prepare this case in federal court.

126.    The failure to provide Plaintiffs all transcripts at no-charge in compliance with *34 CFR §*

*300.512(C)(3)* violated Plaintiff's due process rights of the Fourteenth Amendment of the United

States Constitution. *42 U.S.C. § 1983 Civil Action for Deprivation of Rights.*

**(ALLEGATION-10) DEFENDANTS ARE UNABLE TO PROVIDE K.A. *FAPE*, THUS PRIVATE PLACEMENT IS NECESSARY AND PROPER.**

127.    The *IDEA* permits Defendants to place children with disabilities in private schools.

Although Defendants are required to provide *FAPE*, the "public" education requirement does

not mandate placement in a public school in all cases.

128.    Certain special needs children may be placed in or referred to a private school or facility

by a public agency as a means of providing special education and related services.

**129.**    The Cranbrook School of Bloomfield Hills, Michigan (or similar private placement) will

provide *FAPE, the least restrictive environment (LRE),* safe environment, and is proper for K.A.

who has numerous special education needs.  In <u>Tuscon Unified School District</u> v. <u>Murray ex rel.</u>

<u>Kline</u>, *33 IDELR 239 (D. Ariz. 2000)* that court found that in some cases private facilities for

disabled children is necessary for *FAPE* with the *LRE*. This Court must order Defendants to

consider private placement of K.A.

**(ALLEGATION-11) CIVIL ACTION FOR THE DEPRIVATION OF RIGHTS,** *42 U.S.C. § 1983 – LITERACY.*

> **(i)** *K.A.'s Literacy Is a Fundamental Right, and there is a disparity in State education resources to K.A. and those similarly situated juxtaposed to non-minorities and non-disabled minorities*

130.    K.A.'s M-STEP scores for reading and mathematics are abysmal, and demonstrate she is years behind grade level.  K.A. is being passed from year-to-year even though she is not learning. This child like so many children within DPS cannot read, write, or perform mathematics at grade level. K.A. is not acquiring necessary and proper literacy skills to function in society. Likewise, are children similarly situated to K.A.

131.    Literacy plays a unique role in our democracy, enabling people to access the rights and discharge the obligations of citizenship and participation in public and private life. Literacy is so important that every state commits to teach it to all children, and indeed requires children to attend school so it can do so. Yet the State of Michigan, which directly oversees public education in Detroit, has functionally excluded K.A. from its statewide system of public education, denying her the opportunity to attain literacy. Achievement data generated and collected by the State documents the near-universal failure to meet proficiency standards in Detroit schools and the consequent high drop-out and low college attainment rates for DPS children in general. These dramatic proficiency shortfalls result predictably and inevitably from the systemic failures in DPS' schools that are antithetical to learning and teaching. Despite its awareness of this education crisis, the State has failed to take sufficient measures to maintain and ensure that effective literacy instruction is available to K.A. and all students like K.A.

132.    Literacy is central to the American tradition of education; in fact, it is the basic unit of education. Literacy is necessary for success not only in English/Language Arts, but also for subject-matter competency in other core subject areas like history, science, and math. As the U.S. Supreme Court has repeatedly emphasized and decades of social science confirm, literacy is essential to succeed in higher education and the workplace, to be an informed citizen capable of participating in a democracy, and to secure personal well-being. This is why Michigan—and every state—makes public education available to every child and even compels children to attend school full time and mandates testing to determine whether students are benefitting from the required instruction. The unique importance of literacy to civic, political, and economic participation means that effectively excluding a discrete class of children like K.A. from the right to an opportunity to attain literacy stamps them with a badge of indignity that will profoundly affect them for the rest of their lives. This stigma places a debilitating burden on these children's morale, psyche, and life chances and creates a caste system that perpetuates the social, economic, and political subordination of low-income communities of color, and the L.D., E.D. of color in Detroit.

   (ii)    *The Meaning of Literacy and Literacy Instruction for K.A.*

133.    Every schoolchild in America grows up learning the "The Three Rs"—reading, writing, and arithmetic. Since the time of Thomas Jefferson, "[T]he [T]hree R's" have made up the basic, skills-oriented work of schools. *Wisconsin v. Yoder, 406 U.S. 205, 226 n.14 (1972).* Education experts agree that to succeed as adults in the twenty-first century, children must learn not just the skill to decode letters and words, but the ability to read and write well enough to access knowledge and communicate with the world. These essential knowledge capabilities—which

include the ability to compose, comprehend, synthesize, reflect upon, and critique—require

conscious and sustained development throughout primary and secondary schooling.[11]

134.   The United States Department of Education ("DOE") has operationalized and ratified

these concepts in its What Works Clearinghouse Institute of Education Sciences ("IES") Practice

Guides, which are prepared by a DOE-appointed and sponsored panel of national literacy

experts to provide evidence-based recommendations for improving literacy instruction and have

been endorsed and adopted by Michigan's Early Literacy Initiative, a major activity of the

Michigan Department of Education.[12] The panel defines reading comprehension[13] as *"the*

*process of simultaneously extracting and constructing meaning through interaction and*

*involvement with written language."[14]* The panel explains that "[e]xtracting meaning is to

understand what an author has stated, explicitly or implicitly. Constructing meaning is to

interpret what an author has said by bringing one's 'capacities, abilities, knowledge, and

---

[11] *See generally* Catherine Snow *et al.*, *"Preventing Reading Difficulties in Young Children"* (1998).
[12] *See* Early Literacy Task Force, Mich. Ass'n of Intermediate Sch. Adm'rs, Gen. Educ. Leadership Network, Essential Instructional Practices in Early Literacy 1, 5 (2016) (setting forth state task force's conclusions regarding research supported instructional practices that could "make a measurable positive difference in the State's literacy achievement"); see also Early Literacy Initiative Overview, Mich. Dep't. of Educ., http://www.michigan.gov/mde/0,4615,7-140-28753_74161---,00.html#acc2
[13] Reading comprehension is also the measure of literacy used to assess whether students are meeting standards in many nationally-administered achievement tests, including the National Assessment of Education Progress (NAEP), the SAT, and the ACT, as well as Michigan's state achievement examinations, including the Michigan Student Test of Educational Progress (MSTEP) and the Michigan Merit Examination (MME).
[14] T. Shanahan et al., Improving Reading Comprehension in Kindergarten Through 3rd Grade: A Practice Guide 5 (2010). The panel noted that this definition of reading comprehension is consistent with the common and widely used definitions of reading comprehension. *Id.*; *see also* M. Kamil, et al., Improving Adolescent Literacy: Effective Classroom and Intervention Practices (2008).

experiences' to bear on what he or she is reading."[15]

135.    Functional adult literacy requires both elementary literacy—the letter-and word recognition abilities and phonetics taught in kindergarten through third grade—and adolescent literacy—the knowledge capabilities that build on primary literacy skills and develop the ability to compose, comprehend, reflect upon, and critique. Because literacy development is progressive and cumulative, evidence-based instruction is required throughout the primary and secondary years.  K.A. lacks all necessary and proper literacy skills.

136.    Elementary literacy acquisition—taught in kindergarten through third grade—requires instruction in the foundational areas of alphabetics (phonemic awareness and phonics), fluency, and comprehension (basic vocabulary and text comprehension). Early literacy instruction is designed to develop a child's basic ability to recognize letters and words, understand spelling-sound relationships, and obtain meaning from print. As students progress through elementary school, they must develop a working understanding of how sounds are represented alphabetically, practice reading to achieve fluency with different kinds of texts, attain sufficient background knowledge and vocabulary to render texts meaningful and interesting, learn strategies for monitoring comprehension and repairing misunderstandings, and maintain interest and motivation to read. DPS has failed K.A. in this area.

137.    When students reach middle and high school without basic literacy skills, they cannot build on these skills to attain more sophisticated and grade-level appropriate comprehension and fluency in the higher grades. But even for students who reach middle school with

---

[15] T. Shanahan *et al., supra* note 14, at 5.

adequately developed primary literacy skills, direct literacy instruction cannot end in the elementary years. The basic literacy skills that students develop in early elementary school do not automatically evolve into the higher-level literacy skills needed to succeed in middle school, high school, and ultimately the adult workplace. Rather, dedicated instruction in adolescent literacy (grades four through twelve) must continue throughout secondary school in the areas of comprehension, motivation, word study, fluency, and vocabulary, and literacy instruction must be integrated into content area classes.  K.A. lacks basic literacy skills and cannot attain more sophisticated grade-level academic skills.

138.    Because literacy development is cumulative and sequentially dependent, students who have been denied early the opportunity to learn fall further behind with each year of schooling as pre-existing gaps are compounded and expanded. For example, students with low reading comprehension skills have trouble progressing further in school because they cannot read age-appropriate texts. There are very few books written at a third-grade reading level that are cognitively appropriate for high school-aged students, so students who are behind in their literacy development often cannot read texts that can engage and educate them with high school content. Failure to engage students with interesting and developmentally appropriate content relevant to their lives then deters students from investing in further development of their literacy skills, causing these students to fall even further behind. Each day that K.A. is denied independent, cognitive testing, necessary and proper remedies, she falls hopelessly further behind academically.

139.     Attaining proficiency in literacy is necessary to achieve mastery of content in all other core subject areas. Without the levels of literacy that the curriculum assumes, students are denied meaningful access to not only content and skills in English Language Arts, but also to mathematics, history/social studies, science, technical subjects, and the visual and performing arts. Students who lack literacy are unable to access word problems in mathematics class, do not sufficiently understand grammatical concepts in English to be able to apply them in foreign language class, lack the vocabulary to express their thoughts in laboratory reports in science class, and lack the reading comprehension skills to access textbooks that deliver high-school level content in history class. As a result, schools that fail to deliver to students the opportunity to attain literacy deprive students of the ability to satisfy national and state standards in any content area and leave students unable to compete with their peers elsewhere in the state and nationally. As a proximate result of K.A.'s significant deficiencies in literacy, she is unable to progress in mathematics, history/social studies, science, technical subjects, and the arts.

140.     The essential role of literacy, and its role as a gateway to other subject matter content, is nationally recognized in the development and adoption of Common Core State Standards in English Language Arts & Literacy in History/Social Studies, Science, and Technical Subjects. The Common Core standards were developed by education leaders in 48 states with the purpose of establishing a set of uniform and clear standards that ensure "all students have the skills and knowledge necessary to succeed in college, career, and life upon graduation from high school, regardless of where they live."[16] The Common Core English Language Arts/Literacy standards lay

---

[16] Frequently Asked Questions, Common Core State Standards Initiative, http://www.corestandards.org/wp-content/uploads/FAQs.pdf.

out what students should know and be able to do by the end of each grade to ensure they

graduate from high school prepared for college and career. Michigan adopted the Common Core

standards in June 2010.[17] K.A. will not acquire necessary skills to succeed.

### (iii.) K.A.'s Literacy Guarantee Is the Foundation of Citizenship and Well-Being in a Democratic Society

141.    Literacy is, and always has been, uniquely significant to American civic life because it is

essential to the maintenance of a robust and well-functioning democracy and plays a

determinative role in the economic participation, well-being, and life chances of individuals. The

U.S. Supreme Court has repeatedly recognized that literacy lies at the foundation of citizenship

and participation in democratic society. In _Brown v. Board of Education of Topeka_, for example,

the Court eloquently expressed the "importance of education to our democratic society":

> It is required in the performance of our most basic public responsibilities,
> even service in the armed forces. It is the very foundation of good
> citizenship. Today it is a principal instrument in awakening the child to
> cultural values, in preparing him for later professional training, and in
> helping him to adjust normally to his environment. _See, Brown v. Bd. of
> Ed. of Topeka_, 347 U.S. 483, 493 (1954).

142.    In _Plyler v. Doe_, 457 U.S. 202 (1982), the Court likewise stressed education's

"fundamental role in maintaining the fabric of our society" and the "significant social costs

borne by our Nation when select groups are denied the means to absorb the values and skills

upon which our social order rests." _at 221_. The _Plyler_ Court went on to explain, "[b]y denying . .

. children a basic education, we deny them the ability to live within the structure of our civic

---

[17] Common Core Standards Fact Sheet: Frequently Asked Questions, Michigan Department of
Education, available at
https://www.michigan.gov/documents/mde/FAQ_4.10.13_418299_7.pdf.

institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." *Id. at 223*.  K.A. has a fundamental right to a basic education.

143.   **K.A.'s Future Participation in the Political Process:** Literacy is a prerequisite to constitutionally protected participation in the political process. As the Supreme Court recognized in *Yoder*, "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *406 U.S. at 221*. Without access to basic literacy skills, citizens cannot engage in knowledgeable and informed voting for the candidates of their choice, much less read and comprehend the complicated ballot initiatives that populate state and municipal ballots. Nor can citizens effectively exercise their right to engage in political speech and public discourse regarding the important civil and political issues of the day.

144.   **K.A's Future Participation in Activities of Citizenship:** Literacy skills are also necessary to engage in many other activities of citizenship. Applicants seeking to enlist in military service must pass the Armed Services Vocational Aptitude Battery, a multiple-choice test administered on a wide range of subjects including word knowledge and paragraph comprehension. Individuals without basic literacy skills cannot complete written application forms necessary to obtain government entitlements such as Medicare, Medicaid, Social Security Disability Insurance, or General Relief benefits. Nor can they comply with mandatory government requirements such as filing tax forms or selective service registration. As many scholars and commentators have noted, as activities become digitized in the twenty-first century economy,

literacy has become even more essential for carrying out these citizenship activities.[18]

145.    **K.A.'s Future Access to Justice:** Individuals denied the opportunity to attain literacy are also effectively precluded from constitutionally protected access to the judicial system. In practice, literacy skills are a functional prerequisite to a number of activities that are not only essential to access the courts but are constitutionally protected in their own right, including the retention of an attorney and the receipt of notice sufficient to satisfy due process. Likewise, lack of literacy also precludes meaningful participation in the judicial process, including serving as a member of a jury.

146.    **K.A.'s Educational Attainment and Future Economic Participation:** Individuals who have been denied access to literacy experience significant barriers to participating in the workforce and securing economic self-sufficiency. The Supreme Court has recognized that "education prepares individuals to be self-reliant and self-sufficient participants in society." *Yoder, 406 U.S. at 221.* National data backs up what is readily apparent: individuals with low literacy are often unable to earn wages adequate to support themselves and their families, and they are less likely to be employed at all. These trends begin with educational attainment: students who lack literacy skills are less likely to graduate from high school, and those who do are unprepared for admittance and success in post-secondary education. Data from the National Association of Adult Literacy("NAAL"), which is sponsored by the U.S. Department of Education's National

---

[18] *See, e.g.,* Caitrin Blake, *"The Changing Landscape of 21st-Century Literacy,"* Concordia University Nebraska (Aug. 21, 2014), http://online.cune.edu/the-changing-landscape-21st-century-literacy/; Preparing 21st Century Students for a Global Society, National Education Association 5 (2011); Timothy Shanahan, Introduction, in Developing Early Literacy: Report of the National Early Literacy Panel, National Institute for Literacy xii (2008), available at http://lincs.ed.gov/publications/pdf/NELPReport09.pdf.

Center for Education Statistics reflects that individuals with the lowest levels of literacy are less likely than their peers to graduate from high school and succeed in post-secondary education.

147.     Data from the Bureau of Labor statistics shows that greater educational attainment is positively correlated with higher median weekly earnings and negatively correlated with unemployment.[19] The chances of children in the lowest income quintile making it to the highest quintile nearly quadruples with a college degree,[20] but a low-income individual without a college degree will very likely remain in the lower part of the national earnings distribution.[21] Sadly, if K.A.'s denial of access to literacy is left to continue, this means she is unlikely to ever escape from poverty.

148.     Adults with low literacy face a significant economic disadvantage, earning lower wages and experiencing higher unemployment rates. NAAL data reveals that 43% of adults with the lowest levels of literacy live in poverty, as compared to only 4% of those with the highest levels of literacy. Adults with lowest levels of literacy who work full time are more likely to be low-wage workers. Even controlling for educational attainment and all other personal characteristics, adults who had difficulty filling out forms were more likely to be low-wage workers. And low-literacy adults are less likely to be employed at all. Those with the lowest literacy levels were 16.5 times more likely than those in the highest literacy group to receive

---

[19] U.S. Bureau of Labor Statistics, Employment Projections, http://www.bls.gov/emp/ep_chart_001.htm
[20] Exec. Office of the President, Increasing College Opportunity for Low Income Students: Promising Models and a Call to Action (2014), *see* https://www.whitehouse.gov/sites/default/files/docs/white_house_report_on_increasing_college_opportunity_for_low-income_students_1-16-2014_final.pdf.
[21] Michael Greenstone *et al.*, The Hamilton Project, Thirteen Economic Facts About Social Mobility and the Role of Education (2013).

public assistance in the past year.[22]

149.    The damage lack of literacy does to employment prospects can be seen in the numbers of applicants from Detroit who cannot pass the entrance exams for the plumbing and electric unions, written exams that also require basic mathematical skills. This in turn affects Detroit as a whole, which cannot find sufficient local labor to rebuild areas that have remained burnt out for decades, or build new housing, or do other work necessary to restore the city center to life.

150.    **K.A.'s Future Is Incarceration and Crime:** "Illiteracy is perhaps the strongest common denominator among individuals in correctional facilities."[23] Research shows a strong association between low levels of educational attainment and the onset, frequency, persistence, and severity of delinquency.[24] One study found that reading failure was more predictive of aggression in confined delinquent adolescents than any other factor considered, including age, family size, number of parents present in the home, rural versus urban environment, socioeconomic status, minority group membership, or religious preference.[25] A report sponsored by the U.S. Department of Education asserts that "literacy and criminality are

---

[22] *See,* William C. Wood, *Literacy and the Entry-Level Workforce: The Role of Literacy and Policy in Labor Market Success* (June 2010) (analyzing NAAL data).

[23] William Drakeford, *The Impact of an Intensive Program to Increase the Literacy Skills of Youth Confined to Juvenile Corrections,* 53 J. of Correctional Educ. 139, 139 (2002).

[24] *See, e.g.,* Center on Crime, Communities, and Culture, *Education as Crime Prevention: Providing Education to Prisoners,* Research Brief (1997); Denise C. Gottfredson, *School-based Crime Prevention, in Preventing Crime: What Works, What Doesn't, What's Promising* (1995); Eugene Maguin & Rolf Loeber, *Academic Performance and Delinquency, in Crime and Justice: A Review of the Research* (1996).

[25] Dennis L. Hogenson, *Reading Failure and Juvenile Delinquency,* 24 Bull. of the Orton Soc. 164 (1974).

umbilically joined;"[26] another sponsored by the U.S. Department of Justice argues that "the link between academic failure and delinquency, violence, and crime is welded to reading failure."[27] Youth with pronounced reading difficulties are vulnerable to marginalization in their schools and lifelong risk of involvement in the juvenile and criminal justice systems.[28] One of the first national studies of the link between reading failure and delinquency found that the average reading ability of incarcerated adolescents was at the fourth-grade level and that more than one third of the youth were illiterate.[29] A more recent study examining reading comprehension of detained and committed youth found that the average reading ability of incarcerated adolescents has since decreased.[30] According to the National Assessment of Adult Literacy Prison Survey, at least half of all incarcerated adults surveyed scored "basic" or "below basic" in each of three literacy categories: prose, document, and quantitative.[31] This means the adults lacked the literacy skills to perform such everyday tasks as following directions using a clearly labeled map, or determining what time medicine can be taken based on a prescription drug label.[32] Only 5% of incarcerated adults had literacy skills that were "proficient."[33] **K.A.'s paternal**

---

[26] Anabel P. Newman *et al.,* National Center on Adult Literacy, *Prison Literacy: Implications for Program and Assessment Policy* (1993).

[27] Michael S. Brunner, Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, *Reduced Recidivism and Increased Employment Opportunity Through Research-Based Reading Instruction (1993)*

[28] Peter E. Leone *et al., Organizing and Delivering Empirically Based Literacy Instruction to Incarcerated Youth, 13 Exceptionality 89 (2005).*

[29] Brunner, *supra* note. 19

[30] Leone, *supra* note 20, at 95.

[31] Elizabeth Greenberg *et al., Literacy Behind Bars: Results from the 2003 National Assessment of Adult Literacy Prison* Survey 13 (2007). According to the survey, 56% of incarcerated adults scored "basic" or below in prose literacy; 50% in document literacy; and 80% in quantitative literacy.

[32] *Id.* at 6-7.

[33] *Id.* at 13.

grandfather, great-grandfather, and great-great-grandfather were all in the Michigan criminal justice system and did not graduate high school. This child's paternal great-grandfather died of a heroin overdose in Detroit. K.A.'s mother (Plaintiff) is fighting to keep K.A. out of the criminal justice system, and to afford her a chance in life.

151. **K.A.'s Future Health Outcomes:** The link between literacy and health outcomes has likewise been extensively documented in social science and medical literature. In fact, literacy skills are more predictive of an individual's health status than are race, income, employment status, education level, or age.[34] At least two studies have shown that health disparities in both race and educational attainment were attenuated and, in some cases, eliminated after accounting for literacy.[35] Literacy plays an essential role in child and adolescent health in particular: research has repeatedly shown that children with low literacy experience worse health outcomes and behavior.[36]

152. One study of adolescents from low-income neighborhoods found that youth who read two years or more below grade level were more likely to engage in risky behaviors and be in a physical fight that required medical treatment than youth who were reading at grade level.[37]

---

[34] Jennifer F. Wilson, *The Crucial Link Between Literacy and Health*, 139 Ann. of Internal Med. 875 (2003).

[35] Somnath Saha, *Improving Literacy as a Means to Reducing Health Disparities*, 21 J. of Gen. Internal Med. 893 (2006); *see also* Barry D. Weiss *et al.*, *Health Status of Illiterate Adults: Relation Between Literacy and Health Status Among Persons with Low Literacy Skills*, 5 J. of the Am. Bd. of Family Practice 257 (1992).

[36] Darren DeWalt & Ashley Hink, *Health Literacy and Child Health Outcomes: A Systematic Review of the Literature*, 124 Pediatrics S265 (2009).

[37] Terry C. Davis *et al.*, *Low Literacy and Violence Among Adolescents in a Summer Sports Program*, 24 J. of Adolescent Health 401–11 (1999).

153.     Pursuant to ALJ Smith's August 28, 2023 **Decision and Order**, K.A. is a quiet child who missed 32 days of school during the 2021-2022 school year. *See, Exhibit 1, p. 12 ¶ 12, and p. 12 ¶ 21.* Being years behind academically with unaddressed special needs makes school a very unhappy place socially and psychologically for K.A. and similarly situated children at DPS.

154.     Furthermore, on the issue of K.A.'s future health outcomes multiple studies have demonstrated the link between literacy and health outcomes in the management of chronic diseases such as diabetes,[38] asthma,[39] and HIV.[40] Death rates for chronic disease, communicable diseases, and injuries have been shown to be inversely related to literacy.[41] Lack of literacy impedes the ability to make appropriate health decisions and according to Proliteracy, "an excess of $230 billion a year in health care costs is linked to low adult literacy."[42]

### (iv.)     The Tradition of Compulsory Education in the United States Guarantees K.A.'s Literacy Right

155.     Literacy's essential role in the maintenance of democracy is reflected in education's unique status as not only a public good that we have committed to make available to all children since the earliest days of our republic, but also an activity in which participation is mandatory and coerced through compulsory education laws. That is, access to literacy is not only guaranteed to every child, it is required of every child, creating a special relationship between

---

[38] Dean Schillinger *et al.*, *Does Literacy Mediate the Relationship Between Education and Health Outcomes? A Study of a Low-Income Population with Diabetes*, 121 Pub. Health Reps. 245–54 (2006).
[39] Carol A. Mancuso & Melina Rincon, *Impact of Health Literacy on Longitudinal Asthma Outcomes*, 21 J. of Gen. Internal Med. 813–17 (2006).
[40] Seth C. Kalichman *et al.*, *Adherence to Combination Antiretroviral Therapies in HIV Patients of Low Health Literacy*, 14 J. of Gen. Internal Med. 267–73 (1999).
[41] Rima Rudd *et al.*, *Literacy and Health in America*, Educ. Testing Service, 5 (2004).
[42] *See* "Adult Literacy Facts," Pro-Literacy, https://proliteracy.org/Resources/Adult-Literacy-Facts

the state and children between the ages of 6 and 18. The universal provision of public education has deep roots in U.S. history and laws. Every state constitution includes a provision establishing a state duty to provide public education. Indeed, as early as the Articles of Confederation in 1781 the Continental Congress imposed the development of public schools as a condition for admitting states into the union. The Supreme Court has recognized that "providing public schools ranks at the very apex of the function of a State." *Yoder, 406 U.S. at 213*. States have actualized this duty by investing significantly in schools. 2013 Census Bureau data shows that states collectively spend almost 30% of their budgets on education.

156.    The compulsory nature of education is likewise an essential feature of the American political system. Schooling is compulsory for all children in the United States; every state in the union has had a compulsory education law since at least 1918. Michigan's law, for example, dates to 1871 and now requires every child from ages six to eighteen to attend school full-time. *Mich. Comp. Laws § 380.1561*. These compulsory attendance laws reflect a national judgment that education is so essential to the maintenance of democracy and the ability to participate in public and private life that compelling it is justified. The cruel irony is how does K.A. (a quite little girl) avail himself of a compulsory education when she is denied evaluation(s) and special education benefits. Thus, being years behind academically with unaddressed special needs makes school a very unhappy place for K.A.  As a child, K.A. no-doubt misses school because the institution does not serve her unaddressed needs.

### (v.)   K.A.'s Exclusion from Access to Literacy Creates an Enduring Stigma

157.    Given the universal provision of literacy and its supreme importance to civic, political,

and economic participation, excluding children from the opportunity to become literate marks

them with a badge of shame and indignity that profoundly affects them for the rest of their

lives. The _Plyler_ Court's finding that the "stigma of illiteracy" takes an "inestimable toll" on the

"social economic, intellectual, and psychological well-being of the individual," _457 U.S. at 222-_

_23_, is borne out by decades of social science research. Severe literacy deficits inflict

immeasurable damage to the mental health and self-esteem of students and require greater

resilience to remediate with each passing year. Studies have demonstrated a significant

relationship between reading level and mental health, with one finding that the psychological

health of subjects with extremely low reading levels was comparable to that of populations with

severe psychosocial disabilities.[43] Students with low literacy may act in ways too frequently

labeled as disruptive or defiant in the classroom, in order to deflect being seen by others as a

student who cannot read. Or some may hide in plain sight like K.A.

158.    The denial of access to literacy also creates a discrete underclass in our society, which

"presents most difficult problems for a Nation that prides itself on adherence to principles of

equality under law." _Plyler, 457 U.S. at 219_. The denial of literacy has long been used as a tool to

subordinate marginalized groups. Indeed, the denial of access to literacy was employed as a

badge of slavery—a tactic, as the Court has recognized, used to subordinate and dehumanize

slaves, and to deprive them of legal and human rights.[44] Later, literacy requirements were used

---

[43] Weiss, _supra_ n. 27 at 257.

[44] _Regents of Univ. of California_ v. _Bakke_, 438 U.S. 265, 387-88 (1978) ("Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted

as tools to discriminate against subordinated populations by barring them from voting.[45]

159.     Reacting against such stigma, and acknowledging the power of literacy, Black-Americans

have placed a special value on acquiring literacy since the time of slavery. Even under the yoke

of slavery, when learning to read was prohibited, some slaves devised creative and subversive

means to do so. When slavery ended, those who had acquired literacy became the first teachers

of their fellow freed people, called on society to assist in teaching, building schools, and

supporting teachers, and claimed education as a right.[46] During this period, the literacy rate

among Black-Americans rose sharply from 5% at the end of the Civil War to 50% by 1900. This

commitment to education persists within the Black-American community to this day.

160.     The student body population of DPS is approximately 81.6% Black, 13.9% Latino, 2.5%

white, 1.5% Asian, and about 2% other.[47] Today, in the 21st century, it is a Black-American

controlled municipal government under the auspices of the State of Michigan which denies K.A.

literacy, *IDEA* rights, and subordinates her to a life of poverty, sickness, crime and even

---

from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal
rights. *It was unlawful to teach him to read*; he could be sold away from his family and friends at
the whim of his master; and killing or maiming him was not a crime. The system of slavery
brutalized and dehumanized both master and slave.") (emphasis added).

[45] *See, e.g.,* Katzenbach v. Morgan, *384 U.S. 641, 653-54 (1966); see also* Oregon v. Mitchell, *400
U.S. 112, 147 (1970) (*Douglas, J., partial concurrence) ("[Literacy tests] have been used at times
as a discriminatory weapon against some minorities, not only Negroes but Americans of
Mexican ancestry, and American Indians").

[46] Heather Williams, Self-Taught: African American Education in Slavery
and Freedom (2007); James D. Anderson, The Education of Blacks in the South,
1860-1935 (1988).

[47] https://www.usnews.com/education/k12/michigan/districts/detroit-public-schools-
community-district-
113404#:~:text=The%20student%20body%20at%20the%20schools%20served%20by,and%200.1
%25%20Native%2Hawaiian%20or%20other%20Pacific%20Islander.

premature death.

161.    This denial of access to literacy to a discrete group of students (such as K.A.) demeans and excludes them, resulting in separate and unequal schooling that "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." _Brown, 347 U.S. at 494 (1954)._

###### (vi.)    DPS failed to provide K.A. Literacy because it is a continuing failed system, and Michigan is Ultimately Responsible

162.    The State of Michigan is ultimately responsible for complying with all constitutional mandates regarding public education. But it has particular responsibility for the schools in Detroit, as in 1999 to about 2016 it took direct controlled over DPS. During this period of State management and control, the Detroit schools have been decimated through disinvestment and deliberate indifference which today adversely impacts K.A. Today, DPS children like K.A. are in a precarious condition characterized by indefensibly low achievement scores, low academic achievement, high drop-out rates, illiteracy, and high school diplomas which have no value.

163.    According to information from the National Assessment of Education Progress examination results for 2015, prior to COVID, Michigan is ranked last—43 out of 43 reported jurisdictions—in reading proficiency for fourth grade **Black-American** students.[48] In fourth grade reading and math, about 91% of **Black-American** students are below proficiency.[49] In eighth

---

[48] _See_ Nat'l Ctr for Educ. Stats., 2015 Reading Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results (2016), _available at_ http://www.nationsreportcard.gov/reading_math_2015/#?grade=4
[49] _See id._; Nat'l Ctr for Educ. Stats., 2015 Mathematics Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results (2016), _available at_

grade reading, 91% of **Black students** are below proficiency in reading and 95% are below proficiency in math.[50] DPS students ranked last in reading and math proficiency among all big-city school districts.[51] Today, indigent children of color like K.A. within DPS are still not proficient in reading and mathematics.

**(ALLEGATION-12) MICHIGAN IS RESPONSIBLE AND LIABLE TO K.A. FOR PUBLIC EDUCATION PURSUANT TO STATE LAW**

164.    In Michigan, the ultimate legal obligation for providing education and for protecting legal rights with respect to education rests with the State. Michigan's State Constitution was derived from the *Northwest Ordinance of 1787*, which conditioned Michigan's statehood on its setting aside land to be used for funding public schools. Article III of the Northwest Ordinance provided: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, *schools and the means of education shall forever be encouraged.*" (*Emphasis added.*)

   (i.)    *Michigan Constitution guarantees K.A.'s free public education and the State has failed to execute a policy to insure K.A. a free public education pursuant to the Michigan Constitution*

165.    The State's founding Constitution—as well as its three successive Constitutions—retained language and added additional language defining the State's role in providing for public schools. Michigan's current State Constitution mandates that "[t]he Legislature shall maintain

---

http://www.nationsreportcard.gov/reading_math_2015/#?grade=4.
[50] *Id.*
[51] See Nat'l Ctr. for Educ. Stats., 2015 Mathematics TUDA Assessment Report Card (2016), *available at*
http://www.nationsreportcard.gov/reading_math_2015/#?grade=4; Nat'l Ctr for Educ. Stats.,
2015 Reading TUDA Assessment Report Card (2016), *available at*
http://www.nationsreportcard.gov/reading_math_2015/#?grade=4

and support a system of free public elementary and secondary schools as defined by law," *Mich. Const., art. VIII, § 2,* and vests "leadership and general supervision over all public education" in the State Board of Education, *id. art. VIII § 3.* Throughout its history, the Michigan Supreme Court has interpreted these provisions to establish the State's ultimate decision-making authority over and legal obligation to supervise the Michigan public school system. In 1917, for example, the Michigan Supreme Court declared, "We have repeatedly held that education in this State is not a matter of local concern, but belongs to the State at large." *Bd. of Educ. of City of Grand Rapids v. Bacon, 196 Mich. 15, 17; 162 NW 416 (1917*). Under Michigan's constitutional structure, local school districts are creations and agents of the State. The Michigan Legislature created local school districts for the administrative purpose of effectively delivering public education, and these districts possess only those powers that the State has delegated to them, either expressly by statute or otherwise.

166.    Similarly, Michigan's public-school academies, commonly known as charter schools, are subject to the same constitutional provisions as the local school districts. *Mich. Comp. Laws § 380.501(1)* ("A public school academy is a public school under *section 2 of article VIII of the state constitution of 1963*, is a school district for the purposes of section 11 of article IX of the state constitution of 1963 . . . and is subject to the leadership and general supervision of the state board over all public education under *section 3 of article VIII of the state constitution* of 1963."). Charter schools are thus "under the ultimate and immediate control of the state and its agents." Council of Organizations & Others for Educ. About *Parochiaid, Inc. v. Governor, 455 Mich. 557, 573 (1997).* Like traditional public schools, charter schools are subject to the leadership and supervision of the State Board of Education to the same extent as are all other public schools.

*Id. at 583-84.* The Board has powers of supervision over all public education, *Mich. Comp. Laws § 388.1009*, and has the same constitutional authority over charter schools as it does over traditional public school districts. *Council of Organizations & Others for Educ. About Parochiaid, Inc., 455 Mich. at 584.*

167.     The State's role in overseeing Michigan's schools has increased with time. For example, In 1994, the passage of <u>Proposal A</u> shifted responsibility for school funding and authority to determine funding levels from local municipalities to the State. <u>Proposal A</u> expressly eliminated the ability of local taxpayers to approve new taxes to contribute to the schools' general funds. And, in 2013, the legislature passed <u>Public Act 96</u>, which granted Michigan's Treasurer and State Superintendent, in consultation with the school district, the power to dissolve school districts.

168.     While the State of Michigan has ultimate obligation for ensuring access to literacy in all Michigan schools, the State has an additional, even greater responsibility with respect to DPS because the State was the *de facto* administrator of the school district for approximately fifteen years. This period was characterized by primary or exclusive State control over all aspects of the DPS, with little to no local role in decision-making; and, this State control was an absolute failure which still impacts children like K.A. today.

169.     For example, in 2011 the Michigan legislature transferred all decision-making authority over DPS to a State-appointed "Emergency Manager." The emergency manager could unilaterally exercise any authority typically residing in a school board or school superintendent. *See Mich. Comp. Laws § 141.1554(f).* This state action failed, and today K.A. is deprived of *FAPE*, and conditions necessary for meaningful learning and teaching to occur have not materialized.

**(ALLEGATION-13) DECIMATION OF DETROIT PUBLIC SCHOOLS, FAILURE TO EDUCATE K.A., AND INJURY**

170.    The Detroit Public Schools were under the direct authority of the State of Michigan for approximately 15 years. During that period, the State's disinvestment and deliberate indifference contributed to a precipitous decline in DPS that left the approximately 100,000 children of Detroit, overwhelmingly low-income students of color, without the ability to meet their basic educational needs. Although aware of the State's failure to educate children, the State failed to remedy this massive systemic educational deprivation.  K.A. as an indigent child in need of special services is a current victim of this past systemic State failure.

171.    The State's 15-year administration and management of the Detroit schools ushered in and hastened a period of dramatic decline. Achievement scores have remained abysmal— for example, between 2010 and 2013, DPS's overall proficiency scores for seventh grade reading ranged from 23.9% to 33% proficient, compared to a statewide range of 55.6% to 62%. Fifteen years of State's control was marked by hostile decisions adversely impacting the education of minority children that would never be permitted in predominantly white school districts. Today, the standardized test scores of children similarly situated to K.A. are still unacceptable and much lower than majority students statewide.

**(ALLEGATION-14) CONTINOUS FAILED STATE INTERVENTIONS TO ADDRESS LITERACY CRISIS IN DETROIT, AND K.A. HAS A FUNDAMENTAL RIGHT TO LITERACY PIURSUANT TO _GARY B. V. WHITMER_, 957 F.3d 616 (6th Cir. 2020) WHICH HAS BEEN VIOLATED**

172.    The State's first response to the literacy crisis in Detroit was superficial, ill-considered, and counterproductive, driven by Lansing bureaucracy and political considerations instead of the students' educational well-being. Indeed, the State's 15-year interventions in the Detroit

education system can best be summarized as reactive efforts to apply a band-aid over the acute and obvious symptoms of the devastating effects of the State's long-term disinvestment and deliberate indifference. The education system in Detroit is a serious cancer.

   *(i.)*   ***Gary B, et al,. v. Whitmer, et al. 957 F.3d 616 (6th Cir. 2020)***

173.    Next, the Sixth Circuit Court of Appeals ruled 2-1 in *Gary B., et al v. Whitmer, et al.* 957 F.3d 616 (6th Cir. 2020) and held that Detroit children have a fundamental right to a basic education. *Id. 678.* In a well written opinion, *Gary B., et al,* went on to hold:

> Access to a foundational level of literacy—provided through public education—has an extensive historical legacy and is so central to our political and social system as to be "implicit in the concept of ordered liberty." *Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting *Palko v. Connecticut ,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937), overruled by *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). In short, without the literacy provided by a basic minimum education, it is impossible to participate in our democracy. *Id. 642.*

174.    Pursuant to *Gary B., et al,* K.A. has a fundamental right to a basic education; but, still today Michigan has not addressed the root causes of its failures to provide a basis minimum education in any systematic or meaningful way to K.A. or other similarly situated indigent children of color in Detroit.

**(ALLEGATION-15) M-STEP STANDARIZED TEST SCORES PROVE DEFENDANTS' FAILURE TO PROVIDE LITERACY AND FAPE TO K.A.  SUCH FAILURE VIOLATES *IDEA*, AND *GARY B, ET AL, V. WHITMER, ET AL,* 957 F.3d 616, 642 (6th Cir. 2020), AND THE MICHIGAN CONSTITUTION.**

175.    The State's historic deliberate disinvestment in and indifference to the needs of Detroit schoolchildren has had catastrophic consequences for K.A.'s current access to literacy, and *FAPE,* as well as other similarly situated indigent children of color. These systemic State failures

reverberate in DPS today. The ALJ was provided with K.A.'s standardized test records which conclusively proved her abysmal failures, the lack of literacy, and the lack of *FAPE*. Even though the documentary evidence from standardized examination scores were clear and convincing that K.A. was not provided a *FAPE* or literacy pursuant to *IDEA* and <u>*GARY B*</u>, *Id. p. 642,* nevertheless the ALJ overlooked the legitimate needs of this poor child and denied K.A. evaluations and other *IDEA* benefits guaranteed by Congress.

176.    Historical data collected and maintained by the State shows, the literacy instruction provided in DPS' schools is so wholly insufficient that perhaps ninety percent or more of the students are unable to meet state proficiency standards. Many students, like K.A., are multiple grade levels below their peers in other schools throughout the State. This abysmal achievement data reflects a statewide system of education that has functionally excluded K.A. and similarly situated children from its reach.

**(i.)    *The Michigan Student Test of Educational Progress ("M-STEP") is very significant***

177.    Student performance data collected by the State has long established that students at DPS' schools are effectively denied the opportunity to achieve proficiency in literacy, particularly as compared to schools elsewhere throughout the State. The Michigan Student Test of Educational Progress ("M-STEP") measures students' progress toward achieving state-mandated academic content standards. Beginning in 2014-15, the State has required the administration of the M-STEP in the following grades and subjects: English and Math in grades 3-8 and 11; science in grades 4, 7, and 11; social studies in grades 5, 8, and 11. The Michigan Educational Assessment Program ("MEAP") measured the previous state standards prior to the adoption of

Common Core in 2014-15. For years, students in DPS' schools have disproportionately

failed to meet the proficiency standards established by the State in all content areas.  K.A. is

significantly behind, and is falling further behind.

178.    In addition, national data show that students in DPS' schools are lagging far behind their

peers in the rest of the country. Professor Sean Reardon and a team of researchers in the

Stanford Graduate School of Education have analyzed state assessment data for grades three

through eight for each of the 12,000 school districts in the country, data generated and

collected pursuant to the <u>No Child Left Behind Act</u> in order to make state-by-state comparisons.

This historic data showed that students in the DPS schools are, on average, 2.3 grade levels

below their actual grade level in basic reading proficiency.  Plaintiff presented substantial

documentary evidence to the ALJ that all K.A.'s M-STEP scores are many years behind and K.A.

cannot read and write.  Also, DPS' schools are among the poorest performing schools in

Michigan.[52] Children like K.A. are denied literacy and a *FAPE*.

**(ALLEGATION-16) DEFENDANTS' DENIAL OF LITERACY AND A *FAPE* TO K.A. AND THOSE SIMILARLY SITUATED, DENIES THEM GRADUATION AND COLLEGE ATTENDANCE, AND VIOLATES RIGHTS.**

179.    The low proficiency rates in DPS' schools have devastating consequences for educational

attainment and college and career preparedness. As social science research demonstrates, low

academic achievement and a personal perception of incompetency negatively impact student

motivation, engagement, and mental health, which frequently lead to dropping out.[53]  Among

---

[52] *See,* Bouffard, Karen. *"Detroit Schools Rank Last In Graduation Rates."*  The Detroit News (April 1, 2008).
[53] *See, e.g.,* NAT'L RESEARCH COUNCIL, INST. OF MED., ENGAGING SCHOOLS: FOSTERING HIGH SCHOOL STUDENTS' MOTIVATION TO LEARN 13-44 (2004); Fred M. Newmann *et al., The*

high school graduates, students with very low proficiency may lack the credentials, including standardized tests scores and grades, necessary for admission to many colleges and universities. And unfortunately, many low-skilled students who do matriculate to a college or university find that they are many years behind their peers and unprepared for college-level work.  K.A. does not have the academic skills to graduate and attend college because of Defendants' denial of literacy and *FAPE* to her. Therefore, K.A.'s rights to literacy and a *FAPE* are violated by Defendants.

**(ALLEGATION-17) THERE ARE INSUFFICIENT ALLOCATED RESOURCES, TRAINED SPECIAL EDUCATIONAL PROFESSIONALS, SMALL CLASS SIZES, SECURITY, AND TRANSPORTATION SERVICES TO PROVIDE K.A. AND STUDENTS SIMILARILY SITUATED WITH LITERACY AND *FAPE*.**

180.    There is failure to deliver evidence-based literacy instruction, *FAPE,* and intervention programs in DPS' Schools because of: (i) insufficient allocated resources; (ii) insufficient number of special educational professionals; (iii) appropriate small class sizes; (iv) insufficient number of security; and, (v) appropriate school transportation services. Therefore, the universally abysmal achievement outcomes are the inevitable consequences of a systemic failure. This lack of resources to necessary to provide K.A. and similarly situated children with literacy, and a *FAPE* is a legal obligation upon the State to provide.

181.    Experts agree that meaningful access to literacy can be delivered, including in schools serving demographics of students similar to DPS' schools, through a high-quality literacy-focused program and curriculum. Yet DPS schools lack the capacity to provide effective literacy instruction at the elementary or adolescent levels or to intervene with

_____

*Significance and Sources of Student Engagement, in STUDENT ENGAGEMENT AND ACHIEVEMENT IN AMERICAN SECONDARY SCHOOLS* 11-39 (Fred M. Newmann ed., 1992).

appropriate remediation for students who have fallen behind. At all of DPS' schools, there is no evidence-based program for delivering access to literacy and for remediating past and ongoing deprivations. This includes lack of qualified staff, necessary training, instructional materials and tools, protocols for regular assessment and follow up interventions, and identification and elimination of conditions impeding access.

### (i.) *Intervention and Remediation for K.A.*

182.    Furthermore, none of DPS' schools can deliver effective intervention or remediation for students like K.A. who have failed to achieve basic literacy skills in the early elementary years, and will now fail to develop adolescent knowledge capabilities. Intervening with students who are far behind, in particular, requires one-on-one time that is not feasible when a single teacher is serving a large classroom. K.A. requires much one-on-one instruction.

### (ii.)   *Extreme Heat, and Necessity for Air-Conditioned Summer School for ESY*

183.    Absent or malfunctioning heating and air-conditioning systems subject students and teachers to extreme temperatures, sometimes necessitating school closings or early dismissal and thereby frequently preventing effective instruction and meaningful learning. In the past, DPS' schools periodically have experience classroom temperatures that range from so cold the students can see their breath to above 90 degrees, depending on the time of the year. ***ESY must be provided K.A. at an air-conditioned building***.

**(ALLEGATION-18) FAILURE TO PROVIDE J.L. A SAFE SCHOOL ENVIRONMENT FOR LEARNING.**

184.    DPS also lacks the capacity to provide K.A. and other similar students they serve a

safe and non-violent environment in which to learn. The issue of safety will become even more

evident for K.A. as she ages and enters middle school, junior high school, and high school.

### (i.)    Absence of Support to Address Trauma and Social-Emotional Health

185.    DPS serves high numbers of low-income students, foster youth, homeless youth,

students in the criminal justice system, and students who have experienced or witnessed

violence.  Being years behind academically with unaddressed special needs makes school a very

unhappy place for K.A.  Many of K.A.'s absences are because the Defendants do not serve her

unaddressed needs. Without help, the situation for K.A. will worsen.

186.    Defendants have failed to provide sufficiently trained professionals to address

trauma that middle school, junior high, and high school DPS students encounter.  For example,

after a Detroit area Hamilton student was kidnapped and murdered, his classmates were not

provided any opportunity to grieve. No additional counselors were brought in, and the teachers

were not offered any support or training on how to speak with the students about the tragedy.

Instead,  on the day the police found the boy's body, the only school-wide reaction was an

announcement by loudspeaker to remind the students, who were using their phones to share

details about what happened and to communicate their grief, that cell phones were not allowed

at school.[54]

187.    Unaddressed exposure to trauma and adversity impedes a child's ability to learn,

and students impacted by trauma require social-emotional and trauma-informed support. But

in DPS, teachers and staff are not trained to recognize or respond to childhood trauma, and

---

[54] See, Gary B, et al. v. Richard Snyder, et al., ECF No. 1, pp. 95-95, ¶139.

counseling is not sufficiently available to support children with mental health needs. When

children act in ways motivated by the trauma they have experienced, or act out due to

embarrassment over their inability to perform basic academic tasks successfully, the DPS'

response is to punish and exclude them from the classroom, rather than to implement

restorative practices for support and healing. Or quiet, unassuming children like K.A. are

ignored by Defendants.

**(ALLEGATION-19) UNSUPPORTED AND UNSTABLE TEACHING STAFF AND SUPPORT STAFF INJURE K.A. AND OTHERS SIMILARLY SITUATED**

188.    Defendants' schools still lack a sufficient number of stable and qualified teachers, special

education teachers, support staff, clerical staff, security, and janitorial staff.

> **(i.)    *Vacancies and Lack of Qualified, Full-Time Teachers, Professionals, and staff Injured K.A. and others Similarly Situated.***

189.    Given the challenging teaching and learning conditions in DPS' schools, unsurprisingly

these schools are historically difficult to staff with permanent teachers and administrators and

experience high teacher turnover. Although nationwide there is a current need for more

teachers due to the pandemic, DPS' dearth of qualified professionals and support staff predated

the pandemic. State and DPS failures to adequately staff DPS schools with qualified teachers,

professional, and support staff has injured K.A. and similarly situated children in violation of

their rights. Failure to provide adequate support(s) to students who have experienced adversity

also results in burnout and vicarious trauma among teachers. The frequent teacher turnover on

DPS campuses predictably creates teaching vacancies, some of which occur during the school

year because teachers cannot continue being overworked in these uncomfortable conditions of

very large class sizes, inadequate professional and staff support.

190.    Prior to the pandemic in the 2015-16 school year, there were approximately 170 teacher vacancies in the nearly 100 schools that made up the DPS school system.[55] In the 2016-2017 school year, there were up to 200 vacancies just before the start of the school year.[56] Filling these vacancies with new teachers who possess the necessary background to achieve success in teaching literacy proved difficult to impossible then. Instead, these classes were covered by non-certificated paraprofessionals, substitutes, or misassigned teachers who lack any expertise or knowledge in the course content. Today, because of the pandemic no-doubt this situation with DPS has worsened.

191.    In addition, in today's Detroit market, qualified short-term substitute teachers often cannot be obtained. The remedy for this problem is for Defendants to increase the pay for substitutes. Defendants cannot balance their budgets by denying children like J.L. their rights to basic literacy and *FAPE*.  Increased pay will in turn attract more qualified substitute teachers. As a matter of law the State of Michigan has this legal obligation to improve substitute instruction in DPS.

---

[55] *See* Ann Zaniewski, *DPS Facing Surge of Midyear Teacher Departures*, DETROIT FREE PRESS (Nov. 26, 2015), available at http://www.freep.com/story/news/local/michigan/detroit/2015/11/26/dps-teachersleaving/76311802/.
[56] *See* Josh Sanburn, *Inside Detroit's Radical Experiment to Save Its Public Schools*, TIME (Sept. 6, 2016), available at http://time.com/4390000/detroit-publicschools-charters-debt/; Ann Zaniewski, *Detroit Schools to Hold Teacher Job Fair to Fill 200 Open Positions*, DETROIT FREE PRESS (Aug. 17, 2016), available at http://www.freep.com/story/news/education/2016/08/17/detroit-teacher-jobfair/88888604/

### (ii.)  *Legislation Which Permitted Non-Certificated Teachers Injured K.A. and Others, and is a continuing legacy of problems*

192.    Legislative mis-steps by the State have exacerbated the systemic problem of inadequate

academic instruction for current children like K.A. and denied them literacy and a *FAPE*. Prior to

the pandemic, in June 2016, the State further perpetuated the shortage of qualified teachers in

DPS' schools by passing legislation permitting non-certificated instructors to teach in DPS

schools. Defendant Governor Gretchen Whitmer was directly responsible for maintaining this

systemic problem in Detroit, *to wit:*

> Gov. Gretchen Whitmer, who signed the temporary
> legislation Monday, said the policy change will keep schools
> open and let students learn from instructors they already
> know. The measure, which lets any district employee with a
> high school diploma apply to fill in for certified teachers,
> expires at the end of the 2021-22 academic year in June.[57]

193.    In 2016 this type of legislation did not apply to any school elsewhere in the State. Rather,

it singled out the children of Detroit for separate and inferior treatment. This 2016 legislative

blunder reverberates in DPS today, injures K.A, and others, and must be addressed. Today,

children like K.A. still require additional certified teachers to reduce class sizes.


**(ALLEGATION – 20) DEFENDANTS' EDUCATION SYSTEM IS A FAILED SYSTEM WHERE MANY DETROIT CHILDREN ARE ILLITERATE, AND 47% OF THE ADULT DETROIT POPULATION IS ILLITERATE.**

194.    Detroit schools are a failed system. The question for Detroit schools is **not** graduation

numbers, but literacy. Can Detroit students read and write sufficiently. Detroit public school

---

[57] Deadline Detroit, "Educators troubled that uncertified district workers now can be substitute teachers."  December 28, 2021, available at https://deadlinedetroit.com/articles/29473/educators_troubled_that_uncertified_district_work ers_now_can_be_substitute_teachers

children cannot read and write sufficiently, and therefore the high school diplomas are

illegitimate.

195.    Regarding literacy in the City of Detroit one study found the following:

> More than 200,000 Detroit residents — 47 percent of Motor
> City adults — are "functionally illiterate," according to a new
> report released by the Detroit Regional Workforce Fund. That
> means they can't fill out basic forms, read a prescription, or
> handle other tasks most Americans take for granted.[58]

196.    Currently K.A. is passed from year to year even though she cannot read and write

anywhere near grade level. Therefore, Detroit graduation rates are misleading and bogus.

> Our education system is broken: This study "shows the
> staggering degree to which public education has failed in one
> of the most economically depressed cities in the United States
> . . . ." And it's "even more shocking that half of the illiterate
> population . . . somehow made it through public school."
> Clearly, "taxpayers aren't getting their money's worth. It's too
> bad that half of them "aren't able to read the report to figure
> that out."[59]

   *(i)*    ***The Fact Defendant-DPS is a Predominately Black School System under the
            Dominion Control and Responsibility of Defendant-Michigan, does not Excuse
            Defendants from Violations of the Equal Protection Clause to the Fourteenth
            Amendment for Discrimination on the basis of race and Disability.***

***197.***    Minorities are capable of racial discrimination against other minorities, even those of

the same ethnic group, in violation of law.

---

[58] The Week, by the Week Staff (last up-dated January 8, 2015).
https://theweek.com/articles/484910/detroits-shocking-47-percent-illiteracy-rate
[59] *Id.*

(ii)    *United States Supreme Court Justice Clarence Thomas, and the failure of School Systems to Educate Blacks.*

198.    United States Supreme Court Justice Clarence Thomas put it well by saying:

> When you look at where the real problems are among
> minorities in our society, particularly blacks, it's at the bottom.
> It's the people who are in school systems that don't educate . . .

199.    Defendants deny K.A. literacy, a *FAPE*, because the DPS is a failed system. Defendants know, realize the DPS is a failed system, and intentionally deny K.A. literacy and a *FAPE* on the basis of race and disability in violation of law.

200.    Where a State has undertaken to provide an opportunity for an education in its public schools, such an opportunity is a right which must be made available to all on equal terms. Brown v. Board of Eduction, 347 U.S. 483, 493 (1954). The fact that DPS is a predominately Black run school system with majority Black student population, does not excuse Defendants' violation of the law.

### (IV.)   AVERMENTS

**FIRST CAUSE OF ACTION – Violation of Individuals with *Disabilities Education Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461*.**

201.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

202.    This is an appeal of the 28th August 2023 **Decision and Order** of Administrative Law Judge (ALJ) Paul Smith, which violated the *Individuals with Disabilities Education*

*Improvement Act (IDEA), 20 U.S.C. §§ 1400 – 1461,* federal rights of Plaintiffs, the laws of the United States, the U.S Constitution. The **Decision and Order** must be overturned.

**SECOND CAUSE OF ACTION – ALJ Paul Smith's Finding that the Plaintiff-Mother was not Credible was Based upon Racial and Gender Prejudice in Violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution – Discrimination on the Basis Race and Gender.**

203.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

204.    Plaintiff-mother has a fundamental Constitutional right to a fair due process hearing and to equal protection of the law by a State administrative tribunal. The ALJ's finding that Plaintiff-mother was not credible was without any evidence whatsoever, based upon race and/or sex discrimination, prejudice, and bias, and was unconstitutional.

205.    ALJ Paul Smith was acting under color of state law, thereby violating section  the Fourteenth Amendment, and 1983.

**THIRD CAUSE OF ACTION- K.A. as a Student and/or Disabled Student has a Fundamental Right to Literacy Pursuant to *Gary B., et el., v. Whitmer, et al, 957 F.3d 616 (6th Cir. 2020)*, and that Basic Right has been Violated.**

206.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

207.     Defendants, who are responsible for the education of all public-school students

have denied and continue to deny K.A. the fundamental right of access to literacy and

fundamental interest in access to literacy, as compared to other students in the State of

Michigan receiving an education in Michigan Public Schools.

208.     Defendants were acting under color of state law, thereby violating J.L. basic rights

to literacy pursuant to _Gary B., et el., v. Whitmer, et al., 957 F.3d 616 (6th Cir. 2020)._

**FOURTH CAUSE OF ACTION - Violation of _42 U.S.C. § 1983_ (Plaintiffs Against All Defendants**

**for Violation of Plaintiffs' Due Process and Equal Protection Clauses of the Fourteenth**

**Amendment to the United States Constitution – Discrimination on the Basis of Handicap.**

209.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as

though fully set forth herein.

210.     Defendants, who are responsible for the education of all Michigan public school

students and for the system of Michigan public schools, have denied and continue to deny K.A.

the fundamental right of access to literacy and fundamental interest in access to literacy

because of **handicap**, as compared to other students in the State of Michigan receiving an

education in Michigan Public Schools, by functionally excluding K.A. from Michigan's statewide

system of public education, as described above, in violation of his substantive right to due

process of law, her liberty interest, and her right to equal protection under law protected by the

Fourteenth Amendment to the United States Constitution.

211.    Defendants were acting under color of state law, thereby violating section 1983.

**FIFTH CAUSE OF ACTION - Violation of *42 U.S.C. § 1983* (Plaintiffs Against All Defendants for Violation of Plaintiffs' Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution – Discrimination on the Basis of Race.**

212.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

213.    Defendants, who are responsible for the education of all Michigan public school students and for the system of Michigan public schools, have denied and continue to deny K.A. the fundamental right of access to literacy and fundamental interest in access to literacy because of race, as compared to other students in the State of Michigan receiving an education in Michigan Public Schools, by functionally excluding K.A. from Michigan's statewide system of public education, as described above, in violation of his substantive right to due process of law, her liberty interest, and her right to equal protection under law protected by the Fourteenth Amendment to the United States Constitution.

214.    Defendants were acting under color of state law, thereby violating section 1983.

**SIXTH CAUSE OF ACTION - Violation of the *ADA, 42 U.S.C. § 12101 (a)(1)* (Plaintiffs Against All Defendants for Maintaining a Detroit School System Which Fails to Accommodate the Disabled, Handicapped, and Discriminates Against K.A., and Injures Children with Learning Disabilities, and/or Emotional Disabilities.**

215.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as

though fully set forth herein.

216.    The *ADA, 42 U.S.C. § 12101(a)(1)*, provides: "The Congress finds that—(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;"

217.    Defendants receive federal monies, and pursuant to the *ADA* must not maintain a system which has discriminatory impact upon the disabled.

**SEVENTH CAUSE OF ACTION - (All Plaintiffs Against All Defendants for Declaratory Relief)**

218.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

*219.*    An actual and existing controversy exists between the Plaintiffs and the Defendants because Plaintiffs contend, and Defendants dispute, that Defendants' actions and inactions as described above have violated the *IDEA*, Fourteenth Amendment of the United States Constitution, the *ADA*, and the basic rights to literacy pursuant to *Gary B., et el., v. Whitmer, et al., 957 F.3d 616 (6th Cir. 2020).*

220.    Plaintiffs seek a judicial declaration that the Defendants have violated the foregoing federal rights.

**PRAYER FOR REMEDIES FOR PLAINTIFFS**

**(a.) PURSUANT TO *34 CFR § 300.303(a)(b)(2)* A COURT MAY ORDER DEFENDANTS TO EXECUTE APPROPRIATE EVALUATIONS OF K.A.**

221.    Here, *sub-judice*, the facts prove that Defendants denied K.A. a *FAPE* in violation of

*34 CFR §300.303(a)(b)(2)*, and *IDEA* common law. Wherefore, Plaintiff prays that this Court will

Order Defendants to perform the following evaluations immediately, to wit: (1) a psycho-

educational evaluation with a Woodcock – Johnson II Test; (2) a Weschler Intelligence Scale for

Children evaluation; (3) occupational therapy evaluation; and, (4) a speech and language

evaluation. The foregoing evaluations are necessary and proper to ascertain K.A.'s special

education needs, and provide a *FAPE*.


222.    K.A must be tested for autism because autism is a genetic disability in her family

as her mother testified.  It is imperative that any evaluation of K.A. investigates whether she is

on the autism spectrum.  Such information is vital to determine K.A.'s disabilities, and to execute

an *IEP* which provides *FAPE* in the least restrictive environment *(LSE)*.


**(b.) PURSUANT TO *BOARD OF EDUCATION OF FAYETTE COUNTY V. L.M., 478 F.3d 307, 316 (6th Cir. 2007)* A COURT MAY GRANT K.A. COMPENSATORY EDUCATION.**

223.    Here, *sub-judice*, the facts prove that Defendants denied K.A. *FAPE* in violation of *20*

*USCA § 1412(a)(1), 34 CFR § 300.303(a)(b)(2), 34 CFR § 300.322*, of *IDEA* and common law.

Pursuant to *Board of Education of Fayette County v. L.M., 478 F.3d 307, 316 (6th Cir. 2007)* a

Court can award K.A. compensatory education.

> An award of compensatory education is an equitable remedy
> that a court can grant as it finds appropriate. *20 U.S.C. § 1415
> (i)(2)(C)(iii); see also, Park ex rel. Park* v. *Anaheim Union High
> Sch. Dist.,* 464 F.3d 1025, 1034 (9th Cir.2006)* ("The courts have

discretion on how to craft the relief and there is no obligation to provide a day-for-day compensation for time missed.") (citation and quotation marks omitted). *Board of Education of Fayette County v. L.M., 478 F.3d, 316.*

224.    K.A. has been denied *FAPE* by Defendants for years. Here, *sub-judice*, this Court has the authority to create a compensatory education program which considers all K.A.'s lost special education time. There are 175 school days in Defendant's academic year.  Plaintiffs pray for a day-for-day compensation remedy K.A.

> A school district's failure to timely assess a high school student with an emotional/behavioral disability lead to an administrative law judge's ruling that the district provide the student with six months of compensatory education.  *Independent School District No. 11.* 28 IDELR 1144 (1998).

225.    In *Lewisburg Area School District,* 42 IDELR 315, (2004) a Hearing Officer awarded a student "one full day of compensatory education for each day school was in session" where the student was denied a *FAPE.*

**(c.) PURSUANT TO *34 CFR § 300.105* THIS COURT MAY ORDER DEFENDANTS TO EVALUATE AND PROVIDE K.A. NECESSARY AND PROPER ASSISTIVE TECHNOLOGY.**

226.    Plaintiffs pray that this Court will Order Defendants to evaluate and determine whether K.A. can be awarded a personal computer and tape recorder as assistive technology, which she needs.

> Both state and local educational agencies have obligations with regard to the provision of assistive technology devices and services. Public agencies must provide such devices and services in order to provide *FAPE*, and the *IEP* team determines, what if any, devices and services are required based on the child's unique and individual educational needs.  *Letter to Hutcheson, 30 IDELR 708 (1998).*

227.    Furthermore, *34 CFR § 300.105* determines whether assistive technological devices are

provided to a student:

> Each Public Agency shall ensure that assistive technology devices
> . . .as defined in *Sec. 300.5 – 3006* are made available to a child
> with a disability if required as part of the child's

(a.)    special education under *Sec. 30024*;
(b.)    related services under *Sec. 300.22*; or
(c.)    supplementary services under *Sec. 300.26 & 300.550(b)(2)*. *Jefferson County School
District R – 1, 39 IDELR 119, (2003)*..

228.    K.A. requires a personal computer and a tape recorder as assistive technology, as part of

her special education, related services, and necessary supplementary services.

**(d.) IT IS NECESSARY AND PROPER FOR K.A. TO RECEIVE *ESY* TO PREVENT REGRESSION.**

229.    In *Colchester School District, 30 IDELR 221, 224 (1999)* that case articulated the factors to

consider regarding an award of *ESY* as follows:

> The student is likely to regress in both academic and social skill
> areas if no *ESY* services are provided. Because retaining and
> generalizing certain skills is difficult for the student, he needs
> to have these skills taught and practiced during the year
> without an extended two-and-a-half-month interruption of
> services.  Although regression in social skills is more difficult
> to quantify than academic skills, it is increasingly essential to
> provide him with social skill instruction.  Recoupment of
> skills would occur eventually but, as the student gets older
> and expectation increases, recoupment is more difficult. With
> the student's combination of disabilities, attaining self-
> sufficiency and independence are critical. This is especially
> so given the fact that his disabilities are likely to continue. The
> focus of the student's *ESY* services needs to be a combination
> of functional academic and social skills. These are areas,
> including self-monitoring, reading comprehension, written
> expression and organization skills that require continuous
> instruction. The student's need for services increases as he
> get older.  The vulnerability caused by his disabilities will

become more of a problem and liability as he gets older. The
student's *ESY* services are an essential part of his *FAPE*.
The student's learning will be significantly jeopardized if
services are not provided during the summer.

230.     The analysis in <u>*Colchester School District*</u>*, 30 IDELR 221, 224 (1999)* is spot on *sub-judice*,

and the facts and concepts on *ESY* are cogent to K.A.'s case.  Clearly, evaluations will show K.A.'s

disabilities. Moreover, K.A. is severely behind academically.  K.A. is 10 years old and falling

further behind. Therefore, pursuant to <u>*Colchester School District*</u>*, 30 IDELR 221, 224 (1999) ESY*

is necessary and proper to prevent K.A.'s regression.

231.     *ESY* is appropriate for students with multiple disabilities. Indeed, evaluations will show

K.A.'s disabilities. Children like K.A. with multiple disabilities are at greater risk for truancy,

suspension, and expulsion.[60]  The record shows K.A. missing school already.[61]

232.     Educating children with multiple disabilities requires greater resources and services.

"The advancement of resources and services available to dual-diagnosed students is crucial."[62]

Here, *sub-judice*, because of K.A.'s disabilities *ESY* is legally necessary and factually proper

to prevent her regression.

**(e.) K.A.'S NEIGHBORHOOD SCHOOL IS CLOSED IN SUMMER AND SHE WILL REQUIRE BUS**
**      TRANSPORTATION FOR *ESY*.**

233.     K.A.'s local school is closed in summer, and she will require bus transportation for *ESY*. As

a general rule where the child's school of attendance is closed for the summer, the student will

[60] *See, "Educating Children with Dual Cognitive and Emotional Disabilities,"* 48 Maryland Bar
Journal 28, 35 (2015).
[61] *See, Exhibit 1,* <u>*Decision and Order*</u> of ALJ Smith, p. 12, ¶ 12.
[62] <u>*Id.*</u>

be picked up at their home and transported to the assigned *ESY* site. It is necessary and proper

to provide K.A. bus transportation for *ESY.*

**(f.) THIS COURT HAS AUTHORITY TO COMPEL DEFENDANTS TO PROVIDE PLAINTIFF-MOTHER. A FULL AND COMPLETE COPY OF ALL HEARING AND PRE-HEARING TRANSCRIPTS PURSUANT TO *34 CFR § 300.512(C)(3)* AND AT NO CHARGE.**

234.    The government (Michigan) denied Plaintiff-mother all Hearing and all pre-Hearing

transcripts at no charge in compliance with *34 CFR § 300.512*, and federal law. The government

violated Plaintiffs' due process rights of the Fourteenth Amendment to the United States

Constitution. *42 U.S.C. § 1983 Civil Action for Deprivation of Rights,* and *see,* 34 *CFR § 300.512*.

This Court must immediately order the State of Michigan to provide Plaintiffs the February 1st,

February 23rd, and April 12th 2023 transcripts for their preparation and use in this federal case.

**(g.) THIS COURT MUST ORDER DEFENDANTS TO CONSIDER PRIVATE PLACEMENT OF K.A. IN A PRIVATE SPECIAL EDUCATION PROGRAM BECAUSE OF ITS INABILITY TO PROVIDE *FAPE*.**

235.    Defendants are unable to provide K.A. *FAPE* with the *least restrictive environment (LRE)*,

thus a private placement is proper in a private school.  The *IDEA* permits Defendants to place

children with disabilities in private schools.  Although Defendants are required to provide a

*FAPE*, the "public" education requirement does not mandate placement in a public school in all

cases.

236.    Certain special needs children may be placed in or referred to a private school or facility

by a public agency as a means of providing special education and related services. The

Cranbrook Schools of Michigan (or similar private institution) will provide a *FAPE,* and the *least*

*restrictive environment (LRE)*, safe environment, and is proper for K.A. In *Tuscon Unified School*

_District_ v. _Murray ex rel. Kline, 33 IDELR 239 (D. Ariz. 2000)_ that court found that in some cases residential facilities for disabled children is necessary for a _FAPE_ with the _least restrictive environment_ (_LRE_).

**(h.) PLAINTIFF-K.A. HAS A BASIC RIGHT TO LITERACY AS GUARANTEED BY LAW, AND THIS COURT MUST ENFORCE K.A.'S RIGHTS PURSUANT TO _GARY B., ET AL. V. WHITMER, ET AL, 957 F.3d 616 (6th Cir. 2020)._**

237.    Just as in the case of _Gary B., et al_ v. _Whitmer, et al.,_ "[our]. . .plaintiffs have a fundamental right to a basic minimum education, meaning one that can provide them with a foundational level of literacy." _Id. 662._ This Court must find that K.A. has a fundamental right to literacy.

238.    Plaintiffs pray for injunctive relief requiring Defendants and their officers, agents, and employees to ensure that J.L, has the opportunity to attain literacy.

239.    Plaintiffs pray for the issuance of a declaratory judgment that Defendants actions and inaction complained of herein violate Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution, the _IDEA,_ and the _ADA,_ and federal common law.

**(I.) PLAINTIFFS HAVE A STATUTORY RIGHT TO ATTORNEYS' FEES AND COSTS PURSUANT TO THE _INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT, 20 U.S.C. § 1400 ET SEQ_**

240.    In the matter at bar, Defendants are responsible for reimbursement of reasonable attorneys' fees and costs incurred in this matter. "[I]n any action or proceeding brought under _IDEA,_ the court, in its discretion, may award reasonable attorneys' fees to the parents of the youth who is the prevailing party." _20 U.S.C. § 1415(e)._ Once Plaintiffs demonstrate prevailing party status, the fee applicants then bear the burden of establishing that both the hourly rate

and the number of hours spent on any particular task is reasonable. _In re North_, 59 F.3d 184,

189 (D.C. Cir. 1995). A prevailing party "is one who has been awarded some relief by a court."

See, _Alegria_ v. _District of Columbia,_ 391 F.3d 262.

**(j.) PLAINTIFFS HAVE A STATUTORY RIGHT TO ATTORNEYS' FEES AND COSTS PURSUANT TO _42 U.S.C. § 12205_.**

241.     "The court, in its discretion, may allow the prevailing party, other than the United States,

a reasonable attorney's fee as part of the costs . . . ." _42 U.S.C. § 1988._ Under _42 U.S.C. §1983,_

"[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States or

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." _42_

_U.S.C.§ 1983_.

**(k.) PLAINTIFFS PRAY THAT THIS COURT MAINTAIN JURISDICTION OVER THIS CASE UNTIL ALL JUDICIAL ORDERS ARE COMPLIED WITH BY THE PARTIES.**

242.     Plaintiffs pray that this court will maintain jurisdiction over this case until all orders

issued by this tribunal and complied with.

**(l.) PLAINTIFFS PRAY THAT THIS COURT SHALL PROVIDE ALL RELIEF IT DEEMS JUST AND PROPER.**

Plaintiffs pray for all equitable and legal remedies

Dated:  November 13, 2023

Respectfully submitted,

By: */s/ Roy Carleton Howell*
Roy Carleton Howell (P84099)
8003 Parkside Lane, N.W.
Washington, D.C. 20012
Telephone:  (202) 545-0750
Cell: (202) 445-3263
professorhowell1954@yahoo.com

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

County in which action arose: Wayne

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ashley Jones, Parent and Next Friend of K.A. a Minor

### DEFENDANTS
Gretchen Whitmer in her Official Capacity as Governor of the State of Michigan

**(b)** County of Residence of First Listed Plaintiff   Wayne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Ingham
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Attorney Roy Carleton Howell, 8003 Parkside Lane, NW Washington, DC 20012, (202) 545-0750

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine | | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [x] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
IDEIA 20 U.S.C Sec. 1400-1461;  ADA 42 U.S.C. Sec 12101 et seq;  Civil Rights 42 U.S.C. Sec. 1983
Brief description of cause:
Violation of the federal (and State) education rights of a child.

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   N/A          DOCKET NUMBER   N/A

DATE
November 12, 2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## PURSUANT TO LOCAL RULE 83.11

1.　　　　Is this a case that has been previously dismissed?　　　　　☐ Yes
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☑ No

　　If yes, give the following information:

　　Court: _____

　　Case No.: _____

　　Judge: _____


2.　　　　Other than stated above, are there any pending or previously
　　　　　discontinued or dismissed companion cases in this or any other　☐ Yes
　　　　　court, including state court? (Companion cases are matters in which　☑ No
　　　　　it appears substantially similar evidence will be offered or the same
　　　　　or related parties are present and the cases arise out of the same
　　　　　transaction or occurrence.)

　　If yes, give the following information:

　　Court: _____

　　Case No.: _____

　　Judge: _____


Notes :